11-2265-cv
Simon v. Keyspan Corporation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

(Argued: February 28, 2012     Decided: September 20, 2012)

Docket No. 11-2265-cv

--------------------------------------------------------x

CHARLES SIMON, on behalf of himself and all others
similarly situated,

         Plaintiff-Appellant,

                   -- v. --

KEYSPAN CORPORATION, MORGAN STANLEY CAPITAL GROUP INC.,

         Defendants-Appellees.


--------------------------------------------------------x

B e f o r e :  WALKER, LYNCH, and DRONEY, Circuit Judges.

     Plaintiff-appellant Charles Simon appeals from an order of

the United States District Court for the Southern District of New

York (Shira A. Scheindlin, Judge), dismissing his federal and

state antitrust claims against defendants-appellees KeySpan

Corporation and Morgan Stanley Capital Group Inc.  We agree with

the district court that plaintiff-appellant lacks standing to

pursue his federal claims because he was an indirect purchaser

and that his claims are otherwise barred by the filed rate doctrine. AFFIRMED.

DANIEL J. SPONSELLER, Law Office of Daniel J. Sponseller, Sewickley, PA, (Karin E. Fisch, Judith L. Spanier, Natalie S. Marcus, Abbey Spanier Rodd & Abrams, LLP, New York, NY, on the brief) for Plaintiff-Appellant.

John H. Lyons, Tara S. Emory, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC for Defendant-Appellee KeySpan Corporation.

JON R. ROELLKE, Bingham McCutchen LLP, Washington, DC (Anthony R. Van Vuren, Bingham McCutchen LLP, Washington, DC, Jeffrey Q. Smith, Laila Abou-Rahme, Bingham McCutchen LLP, New York, NY, on the brief) for Defendant-Appellee Morgan Stanley Capital Group Inc.

J. DOUGLAS RICHARDS, Cohen Milstein, New York, NY (Benjamin D. Brown, Cohen Milstein, New York, NY; Richard M. Brunell, American Antitrust Institute, Washington, DC; Christopher L. Sagers, Cleveland-Marshall College of Law, Cleveland State University, Cleveland, OH) for amicus curiae American Antitrust Institute.

JOHN M. WALKER, JR., Circuit Judge:

This appeal requires us to consider whether plaintiff-appellant Charles Simon ("Simon"), a retail consumer of electricity in New York City, can maintain an antitrust action against defendant-appellee KeySpan Corporation ("KeySpan"), a

2

producer of electricity in New York that allegedly colluded with one of its rivals to increase installed capacity prices, and defendant-appellee Morgan Stanley Capital Group Inc. ("Morgan Stanley"), a financial firm that allegedly facilitated KeySpan's anticompetitive conduct. The United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge) dismissed plaintiff-appellant's claims principally on the grounds that he lacked antitrust standing and that his claims were barred by the filed rate doctrine.[1] We agree and conclude that plaintiff-appellant, as an indirect purchaser, lacks standing to bring his federal antitrust claims. We further hold that the filed rate doctrine bars plaintiff-appellant's state and federal claims even though the allegedly supracompetitive rate was the product of a market-based auction.

**BACKGROUND**

In reviewing a motion to dismiss, we accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). Where necessary, we take judicial notice of the regulatory structure governing the New York City electricity market.

---

[1] The district court also concluded that Simon's state law claims were preempted and insufficiently pled. Because we hold that the state law claims are barred by the filed rate doctrine, we need not consider whether the district court was correct on these points.

3

## I. The New York City Electricity Market

The market for electricity in New York City is overseen by the New York Independent System Operator ("NYISO").[2] On the wholesale side, the market is based on the producers' "installed capacity," i.e. the amount of electricity that the producer can supply at a given time. Retail sellers of electricity must purchase enough installed capacity from producers to meet their expected peak demand plus a share of reserve capacity. The system is designed to ensure that the amount of electricity eventually sold to consumers is consistent with the total production capacity of the producers.

In order to determine the price at which producers can sell their capacity, NYISO has established an auction system that results in a market-based rate ("MBR"). Producers submit bids indicating the amount of capacity they can produce and the lowest per unit price at which they are willing to sell. The bids are then "stacked" from lowest to highest price until the total demand for capacity has been met. The point at which demand is met determines the market price for installed capacity and every

---

[2] NYISO is an Independent System Operator ("ISO") created to administer the retail electricity market in New York. See generally Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed. Reg. 21,540 (Apr. 24, 1996) (codified at 18 C.F.R. pts. 35 & 385); see also Cal. Indep. Sys. Operator Corp. v. FERC, 372 F.3d 395, 397 (D.C. Cir. 2004) (describing FERC's efforts to encourage public utilities to create ISOs).

producer stacked below that price point can sell its full capacity for the market price. The producer whose bid set the price can sell as much of its capacity as is necessary to meet demand. The rest remains unsold. Any producer that bid higher than the market price cannot sell its capacity.

The New York City capacity market is highly concentrated. Three firms – defendant-appellee KeySpan, NRG Energy, Inc. ("NRG"), and Astoria Generating Company ("Astoria") – control a substantial portion of the total generating capacity.[3] The total demand for installed capacity cannot be met without at least some of the capacity from each of these three firms. Accordingly, NYISO has imposed a price cap on these firms' bids and barred them from selling electricity outside of the auction process. KeySpan's bid cap is the highest of the three.

II. The Anticompetitive Agreement

As a result of the prevailing market conditions from June 2003 to December 2005, most of KeySpan's capacity was necessary to satisfy total demand. KeySpan therefore routinely bid at its price cap and set the market price at that level. However,

---

[3] These firms were created in 1998 when Consolidated Edison Company of New York, Inc. ("Con Ed") divested most of its generating capacity. The three firms are known collectively as Divested Generation Owners ("DGOs"). See Order Conditionally Approving Proposal, 122 FERC ¶ 61,211, ¶ 3 (2008) ("2008 Market Power Modification Order").

because other producers would be bringing new plants online, KeySpan anticipated that in 2006, supply would increase, leaving KeySpan to either bid below its cap or risk selling only a small amount of its capacity. To avoid these unappealing options, KeySpan indirectly entered into an agreement with Astoria ("the agreement"). Using Morgan Stanley as an intermediary, KeySpan de facto agreed to pay Astoria a fixed income in exchange for any potential profits (after a certain point) from Astoria's generating capacity.[4]

The agreement consisted of two separate deals: the "KeySpan Swap" and the "Astoria Hedge." The KeySpan Swap, executed on January 18, 2006, provided that if the market price after auction were set above $7.57 per KW-month ("the fixed price"), Morgan Stanley would pay KeySpan the difference between the market price and the fixed price multiplied by 1800 megawatts ("MW"). If the market price were lower than the fixed price, KeySpan would pay the difference (times 1800 MW) to Morgan Stanley. The "Astoria Hedge," executed on January 11, 2006, provided that if the market price were higher than $7.07 per KW-month, Astoria would pay Morgan Stanley the difference times 1800 MW. If the price were below $7.07, Morgan Stanley would pay the difference (times 1800 MW) to Astoria. The net effect of the agreement was that Astoria

---

[4] KeySpan had considered acquiring Astoria's physical generating assets, but did not pursue this approach due to antitrust concerns.

was assured of always receiving exactly $7.07 per KW-month for its capacity while KeySpan received any profits (if the market price were above $7.57) and subsidized any losses (if the market price were below $7.07) from the sale of Astoria's capacity. The combination of the KeySpan Swap and the Astoria Hedge enabled Morgan Stanley to receive a fixed rate of fifty cents per KW-month in exchange for facilitating the deal.

As a result of the agreement, it remained lucrative for KeySpan to continue to bid as high as its cap permitted and set the market price at that level. If it then sold only a small amount of its own capacity, it would still receive substantial profits from Astoria's capacity. Since either all of KeySpan's or all of Astoria's capacity would be required by the market, KeySpan stood to make a substantial profit by setting the price as high as possible, i.e., at its cap. In the absence of the agreement, KeySpan would likely have had to bid competitively, which might have lowered the market price of capacity. This was borne out by experience: KeySpan continued to bid at its cap, setting the market price and leaving a significant portion of its capacity unsold. Thus the market price of capacity did not drop despite an industry-wide increase in generating capacity.

## III. Investigations of the Agreement

In May 2007, the United States Department of Justice ("DOJ") began an investigation into the KeySpan agreement based on its anticompetitive effect.  In February 2010, it filed a civil complaint alleging that KeySpan had unlawfully restrained trade.  KeySpan entered into a stipulation with the DOJ to settle the case.  Pursuant to a consent decree, KeySpan paid the United States $12 million and the case was resolved "without trial or adjudication of any issue of fact or law."[5]

FERC also conducted an investigation of the agreement.  Its enforcement office issued a detailed report concluding that KeySpan had not violated FERC's regulations prohibiting market manipulation.  The report noted that

> Market participants in the in-city ICAP [installed
> capacity] market have always known that KeySpan,
> pursuant to the applicable market mitigation rules, was
> permitted to offer at its cap and set the market-
> clearing price.  In addition, as noted, KeySpan's
> offering behavior was consistent with market rules and
> the Commission's announced expectations that DGOs, such
> as KeySpan, would (in the absence of sufficient
> capacity additions) offer their capacity at their caps.

FERC Enforcement Staff Report, Feb. 28, 2008, at 17; Joint Appendix ("J.A.") 89.  FERC agreed with the enforcement staff's

---

[5] The United States also recently settled a civil suit with Morgan Stanley arising from these same facts.  See United States v. Morgan Stanley, --- F. Supp. 2d ---, 2012 WL 3194969 (S.D.N.Y. Aug. 7, 2012).  There, the consent decree required Morgan Stanley to disgorge to the United States Treasury $4.8 million of the net revenues that it had earned from the agreement.  Id. at *2-*3.

report and noted that it had expected KeySpan's cap to set the market price.

IV. The Complaint

Plaintiff-appellant Simon purchased electricity as a retail customer from Con Ed between 2006 and 2009. Con Ed in turn purchased electricity in the form of installed capacity through the previously described New York City auction process. On July 16, 2010, Simon filed this complaint in the district court alleging that the defendant-appellees' conduct had caused him to be unlawfully overcharged for electricity. He sought to represent a class of customers who had purchased electricity from Con Ed between 2006 and 2009. The complaint claimed violations of federal antitrust law as well as New York law.

On March 22, 2011, the district court dismissed all of Simon's federal and state claims with prejudice. Simon v. KeySpan Corp., 785 F. Supp. 2d 120 (S.D.N.Y. 2011). The district court concluded that Simon lacked standing to bring his federal claims because he was an indirect purchaser. Id. at 134-37. It further found that all of his claims were barred by the filed rate doctrine, which precludes legal challenges to rates set or approved by federal agencies, because the rate he sought to challenge was authorized by FERC. Id. at 138-39. The district court also held that Simon's state law claims were preempted and

9

denied leave to amend on the basis of futility. Id. at 139-41. On May 27, 2011, it denied Simon's motion for reconsideration. Simon v. KeySpan Corp., No. 10 Civ. 5437 (SAS), 2011 WL 2135075 (S.D.N.Y. May 27, 2011). It reiterated its holding that Simon's claims were barred by the filed rate doctrine even though it acknowledged that those rates were set at a market-based auction rather than filed directly with FERC. See generally id. Simon appeals.

**DISCUSSION**

We review a district court's decision to grant a motion to dismiss under Rule 12(b)(6) de novo, accepting all factual claims in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. Famous Horse Inc., 624 F.3d at 108. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. We hold that Simon's complaint fails to state a plausible antitrust claim both because he lacks

10

federal antitrust standing and because all of his claims are barred by the filed rate doctrine.

I. Antitrust Standing

Simon's federal claims are barred because he was an indirect purchaser and therefore lacks standing to sue under section 4 of the Clayton Act, 15 U.S.C. §§ 12, et seq.[6]  Generally, only direct purchasers have standing to bring civil antitrust claims. See Ill. Brick Co. v. Illinois, 431 U.S. 720 (1977); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968).  This rule has two rationales.  First, defendants may otherwise face multiple liability.  Ill. Brick, 431 U.S. at 730.  Second, there are too many "uncertainties and difficulties in analyzing price and out-put decisions in the real economic world rather than an economist's hypothetical model."  Id. at 731-32 (internal quotation marks omitted); see also id. at 741-44.  In other words, it is nearly impossible for a court to determine which portion of an overcharge is actually borne by the direct purchaser and which portion is borne by a subsequent indirect purchaser.  The Supreme Court has therefore established a general

---

[6] We need not determine whether Simon qualified for antitrust standing under New York law, see generally Ho v. Visa U.S.A. Inc., 787 N.Y.S.2d 677 (Table) (N.Y. Sup. Ct. 2004), because we conclude that his state claims are barred by the filed rate doctrine.

11

rule that the direct purchaser is the only appropriate antitrust plaintiff.

An indirect purchaser may have standing, however, if it had a pre-existing cost-plus contract with the direct purchaser, meaning that the indirect purchaser has agreed in advance to purchase a fixed quantity, paying the direct purchaser's costs plus a predetermined additional fee.  Id. at 736.

> In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price.  The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

Id.  In this type of situation, there is no difficulty apportioning the overcharge because the indirect purchaser paid the direct purchaser's entire cost.  There is no chance that the indirect purchaser decreased its demand because it had previously agreed to purchase a fixed quantity.  Finally, there is no risk of duplicative liability; the defendant would have a valid pass-on defense against the direct purchaser because the latter suffered no injury.  See id. at 735-36.

The cost-plus contract exception to the indirect purchaser bar is a narrow one that is only appropriate when the contract has removed all doubts about who bore the antitrust injury.  For the exception to apply, the contract quantity must be determined

12

prior to the overcharge to avoid uncertainty about "what effect a change in a company's price will have on its total sales." Hanover Shoe, 392 U.S. at 493. A direct purchaser that passes on all of its costs may still suffer an antitrust injury if passing on increased costs decreased its sales and therefore its profits. Additionally, there must be no possibility that the direct purchaser would have "raised his prices absent the overcharge." Id.

Simon contends that he qualifies for the cost-plus contract exception because Con Ed passed on 100% of its installed capacity costs to its consumers. The complaint alleges:

> Each month from at least May 2006 through February 2008, Con Ed passed through 100% of Con Ed's costs for the purchase of installed capacity in the NYC Capacity Market to its customers. Its customers, including Plaintiff, were contractually required to pay and did pay 100% of such costs as "supply charges" on their monthly billing statements. The quantity of installed capacity for which Plaintiff was required to pay Con Ed was contractually fixed prior to the time the price for such capacity was known and charged to Plaintiff.

J.A. 10. Further, he argues that "[r]etail distribution utilities like Con Ed typically are not permitted to make a profit on the sale of electricity or capacity." Appellant's Br. 33–34.

The Supreme Court has previously addressed the applicability of the cost-plus contract exception to regulated utilities and their retail customers. In Kansas v. UtiliCorp United, Inc., 497

13

U.S. 199 (1990), natural gas wholesalers were sued by several public utilities as well as Kansas and Missouri, acting as parens patriae for their citizens. The Court held that only the utilities, as direct purchasers, were proper plaintiffs. It declined to create an exception to the indirect purchaser rule for situations where regulated public utilities pass on 100% of their costs to consumers. Id. at 208-17. The Court noted that a utility might still suffer an antitrust injury because it might be unable to effect a rate increase that would have otherwise been possible. Id. at 209. Moreover, the Court viewed the presence of government regulation as a complicating, rather than simplifying, factor. This was so because a reviewing court would have to examine whether the regulator would have allowed a rate increase in the absence of the overcharge in addition to determining whether the utility would have sought an increase. Id. at 209-10.

The Kansas Court also rejected the states' argument, even without a general exception, they qualified for the cost-plus exception because the utilities had passed on 100% of their costs to their retail customers. The Court noted that

> [t]he utility customers made no commitment to purchase any particular quantity of gas, and the utility itself had no guarantee of any particular profit. Even though the respondent raised its prices to cover its costs, we cannot ascertain its precise injury because . . . we do not know what might have happened in the absence of an overcharge.

Id. at 218.

14

Simon's attempts to differentiate this case from <u>Kansas</u> are unavailing. We credit the complaint's claim that Con Ed passed on 100% of its installed capacity costs to consumers each month as "supply charges," a portion of the overall bill.[7] The <u>Kansas</u> Court's central concern, however, remains applicable: We cannot say with any certainty what would have occurred in the absence of an overcharge. If the price for capacity had been lower, Con Ed might have requested and received permission to increase its rates. Additionally, increased supply charges might have driven down Con Ed's customers' electricity usage, diminishing its profits. Even though Con Ed does not make a profit on its retail sale of electrical capacity, it does make a profit on its distribution of electricity. Like any business, Con Ed has overhead costs, and the rates it charges reflect a variety of factors in addition to its supply costs. Even if Con Ed increased its rates by exactly the amount it was overcharged for installed capacity, it does not follow that Con Ed's sales and profits were unaffected. In short, Con Ed may have suffered an

---

[7] We share the district court's skepticism that the markets for installed capacity and retail electricity are similar enough to allow a seamless pass-through in this way, but we nevertheless assume for the present that Simon could prove this to be the case at trial. <u>See</u> <u>Simon</u>, 785 F. Supp. 2d at 137 ("[T]he proposition that Con Ed is able to pass through one hundred percent of any overcharge to its consumers in the form of retail price increases is suspect given the differing nature of the two markets.").

15

antitrust injury as a result of the agreement, and therefore under <u>Hanover Shoe</u> and <u>Illinois Brick</u>, it is the only proper plaintiff.

Simon points to the allegation in his complaint that "[t]he quantity of installed capacity for which Plaintiff was required to pay Con Ed was contractually fixed prior to the time the price for such capacity was known and charged to Plaintiff." J.A. 10. Although Simon is further attempting to analogize his situation to that of a cost-plus contract, this argument fails. Simon neglects to account for the fact that he was not contractually obligated in advance to purchase a fixed quantity of electricity each month, we reject this contention as implausible. Con Ed, like all electrical utilities of which we are aware, charges its customers a metered fee based on their actual electricity usage. See <u>Simon</u>, 785 F. Supp. 2d at 137 n.123 (taking judicial notice of Judge Scheindlin's Con Ed bill, which bases the monthly charge on electricity used). Therefore, Simon was free to decrease his electricity usage, and thereby his payments, if supply costs became too high. Further, even if Simon had contracted to buy a fixed quantity of electricity in advance, a contention that is implausible, <u>see Iqbal</u>, 556 U.S. at 678, it would not alter our conclusion because we would still be unable to determine whether

16

Con Ed could have sought and received a rate increase in the absence of the overcharge.

Simon's other attempts to distinguish this case from Kansas are similarly unavailing. He notes that, in Kansas, the utilities were actually present in the lawsuit, making allocation issues unavoidable. This may be true, but the Supreme Court rested its holding on the possibility of allocation difficulties, not their imminence or likelihood. The fact that Con Ed would be a proper plaintiff to sue KeySpan for the same conduct implicates Illinois Brick's concerns about duplicative recovery and apportionment. Simon also points to the fact that the certified question in Kansas stated that the utility "passed on most or all of the price increase" to its customers. 497 U.S. at 205-06 (internal quotation marks omitted). His complaint, in contrast, expressly alleges that all of the cost was passed on. However, the Kansas Court did not leave open the possibility that the plaintiffs could maintain a suit by proving as a matter of fact that the utilities passed on 100% of the overcharge. Additionally, for the reasons discussed earlier, the allegation here that 100% of the costs were passed on is not sufficient to establish standing because it does not negate the possibility that Con Ed might have sought and received a rate increase in the absence of the overcharge.

17

For all of these reasons, we hold that Simon cannot qualify for federal antitrust standing as an indirect purchaser. He did not contract to buy a fixed monthly quantity of electricity from Con Ed in advance, and we cannot determine whether Con Ed would have been able to seek and obtain a rate increase in the absence of the overcharge. The cost-plus contract exception to the bar on indirect purchaser standing is therefore not applicable in this case.

## II. Filed Rate Doctrine

Simon's state and federal claims are also foreclosed by the filed rate doctrine. "Simply stated, the doctrine holds that any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by ratepayers." Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994). This Circuit has not previously addressed whether the filed rate doctrine applies to rates set at market-based auctions as opposed to those set or approved directly by the regulatory agency. There is no need for us to decide whether the filed rate doctrine always applies to market-based auction rates. But we do hold that it applies in the circumstances of this case, where the auction process was circumscribed, and the MBR process was reviewed by the regulatory

18

body which determined the resulting rate to be reasonable. In these circumstances, the filed rate doctrine forecloses Simon's claims.

The filed rate doctrine originated in the context of the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 1, et seq. In Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 160-65 (1922), the Supreme Court addressed an antitrust claim against an association of railroad companies that had colluded to set rates rather than competing with one another. These rates, although the product of collusion, were filed with and approved by the Interstate Commerce Commission ("ICC"). In an opinion by Justice Brandeis, the Court held that because the ICC had determined the rates to be lawful, they could not be challenged in court. The Court posited three rationales for the filed rate doctrine: the lack of need for antitrust remedies in regulated industries (that inherently involve some level of government oversight); the per se legality of rates approved by a regulator; and the difficulty of proving that an alternative lower rate would have been approved by the regulator. Central to the Court's reasoning was the ICA's requirement that rates be nondiscriminatory; if customers were allowed to challenge the rate in court, varying litigation outcomes might result in non-uniform rates.

19

Since Keogh, the filed rate doctrine has "been extended across the spectrum of regulated utilities." Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577 (1981) ("Arkla"). It applies even when a claim is based on fraud or impropriety in the method by which the rate is determined. See Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 415 (1986) (filed rate doctrine bars claim that shippers colluded to fix rate subsequently approved by ICC). The Supreme Court discussed the filed rate doctrine in the context of wholesale electricity rates when it held that rates filed with FERC are binding on state utilities. Entergy La., Inc. v. La. Pub. Serv. Comm'n, 539 U.S. 39, 47-51 (2003).

When the filed rate doctrine applies, it is rigid and unforgiving. Indeed, some have argued that it is unjust. See, e.g., Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 491 (2d Cir. 1998); Ting v. AT&T, 319 F.3d 1126, 1131 (9th Cir. 2003). It does not depend on "the culpability of the defendant's conduct or the possibility of inequitable results," nor is it affected by "the nature of the cause of action the plaintiff seeks to bring." Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d Cir. 1998). It applies whenever a claim would implicate its underlying twin principles of "preventing carriers from engaging in price discrimination as between ratepayers" and "preserving the exclusive role of federal agencies in approving rates." Id. And when the doctrine

20

applies, it bars both state and federal claims.  <u>Arkla</u>, 453 U.S. at 584-85 (1981).

FERC has exclusive authority over wholesale electricity rates.  <u>See</u> 16 U.S.C. § 824e (establishing FERC's power to fix rates); <u>Nantahala Power & Light Co. v. Thornburg</u>, 476 U.S. 953, 966 (1986) ("FERC clearly has exclusive jurisdiction over the rates to be charged . . . [to] wholesale customers.").  The parties do not dispute that Simon's claims are based on the premise that he paid a supracompetitive price for electricity. The only issue we must decide is whether the filed rate doctrine can apply beyond rates set directly by an agency to MBRs set by a regulatory auction scheme.[8]

Although we have not previously addressed whether the filed rate doctrine applies to MBRs, other circuits that have addressed the issue have concluded that the doctrine applies with equal force to MBRs.  <u>See</u> <u>Town of Norwood, Mass. v. New Eng. Power Co.</u>, 202 F.3d 408, 419 (1st Cir. 2000) (applying filed rate doctrine to prices that FERC "left to the free market" because FERC is "still responsible for ensuring 'just and reasonable' rates"); <u>Utilimax.com, Inc. v. PPL Energy Plus, LLC</u>, 378 F.3d 303 (3d Cir.

---

[8] Simon also argues in his brief that the filed rate doctrine is limited to certain statutes and does not apply to rates set under the Federal Power Act, 16 U.S.C. §§ 796, <u>et</u> <u>seq.</u>  This argument is unavailing, as Supreme Court precedent makes clear that the doctrine applies in all instances where rates are set by federal agencies.  <u>See</u> <u>Arkla</u>, 453 U.S. at 577-78.

21

2004) (applying filed rate doctrine when market based rates were "in conformity with the requirements of the FERC and [local authority]-approved market model"); Tex. Commercial Energy v. TXU Energy, Inc. 413 F.3d 503, 509-10 (5th Cir. 2005) (applying filed rate doctrine to MBR tariff in context of state agency that regulated electric utilities); Pub. Util. Dist. No. 1 of Grays Harbor Cnty. Wash. v. IDACORP Inc., 379 F.3d 641, 650-52 (9th Cir. 2004) (rejecting argument that filed rate doctrine does not apply to FERC MBR tariff on the basis that FERC takes steps to ensure that the MBR complies with the statutory mandate that rates be just and reasonable); see also Simon, 2011 WL 2135075, at *2 n.21 (collecting other similar cases from these circuits as well as district courts).  We are not aware of any court holding that the doctrine does not apply to MBRs.[9]

In affirming the application of the filed rate doctrine in this case, we need not announce a per se rule and, in a case that does not require it, are reluctant to do so.  It is not clear to us that the filed rate doctrine, and the rationales underlying

---

[9] Simon's reliance on Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., 554 U.S. 527, 546 (2008), is misplaced.  Morgan Stanley dealt with the Mobile-Sierra doctrine, which applies to "market based tariffs," i.e., bilateral contracts between wholesalers and purchasers that are not directly submitted for rate approval.  Id. at 537-38.  It does not implicate the filed rate doctrine.  See Simon, 2011 WL 2135075, at *2-3 (describing and distinguishing Morgan Stanley opinion).

22

it, should preclude all court scrutiny of alleged anti-competitive behavior affecting the setting of MBRs. The Supreme Court's three rationales from Keogh do not apply with equal force to rates set by MBRs when the only involvement by a regulator is creating the process ultimately corrupted by parties in the market. This is so because antitrust remedies become more necessary as markets become increasingly deregulated by the MBR system. Indeed, some of our sister circuits who have held that the filed rate doctrine applies have taken into account factors such as the level of FERC review. See, e.g., Town of Norwood, 202 F.3d at 418 (noting that the tariffs at issue were "actively at issue in the FERC proceedings"); Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Mktg., Inc., 384 F.3d 756, 760-61 (9th Cir. 2004) (discussing three specific steps taken by the FERC to exercise oversight over the MBR process).

Simon urges us to limit the filed rate doctrine to cases where the regulatory agency itself chose or approved the rate. We acknowledge that Simon's approach has some appeal. Because FERC did not directly set the rate at issue here, it did not specifically determine that the rate was reasonable. Moreover, KeySpan's alleged conduct undermined the competitive market scheme FERC and NYISO had created. One could therefore conclude that the rate arrived at was not the one envisioned by FERC.

23

However, we find that the MBR process established by the FERC in this case was sufficiently safeguarded such that the filed rate doctrine should apply.  A central underpinning of the filed rate doctrine is the desire to "preserv[e] the exclusive role of federal agencies in approving rates . . . by keeping courts out of the rate-making process."  Marcus, 138 F.3d at 58. FERC has chosen to exercise its rate-setting authority in this market by establishing an MBR auction process.  Despite leaving the final price to auction, FERC exercised tight control over the rate by imposing price caps on the major producers.  Tellingly, when FERC capped these producers' bids, it was aware that the producers were "pivotal" (i.e., at least some of their capacity would be required to meet demand), and therefore the market would clear at their cap.  2008 Market Modification Order at ¶ 4. KeySpan's bid cap, specifically approved by FERC, in fact set the market price from 1998 until 2006.  See id.  As the Ninth Circuit has observed,

> the market-based rate regime established by FERC
> continues FERC's oversight of the rates charged.  FERC
> only permits power sales at market-based rates after
> scrutinizing whether the seller and its affiliates do
> not have, or have adequately mitigated, market power in
> generation and transmission and cannot erect other
> barriers to entry.

Grays Harbor, 379 F.3d at 651 (internal quotation marks omitted).

24

Importantly, FERC tightly controls the auction process and has mechanisms in place to remedy the kind of misconduct that allegedly occurred here. FERC has promulgated a rule barring fraud or deceit in connection with the sale of energy. 18 C.F.R. § 1c.2(a). It has the authority to investigate market manipulation in the energy market, and exercised that authority in this case when it investigated the KeySpan agreement for unlawful manipulation. FERC's enforcement division's investigation determined that KeySpan's conduct did not constitute fraudulent market manipulation. FERC Enforcement Staff Report, Docket Nos. IN08-2-000 & EL07-39-000, at 24 (Feb. 28, 2008). FERC adopted this report and concluded that KeySpan's continued bids at its cap were "not only permissible under the NYISO's [tariff] but consistent with the Commission's expectations when the Commission approved [the 1998 divestiture plan]." 2008 Market Power Modification Order at ¶ 145; see Order Establishing Paper Hearing and Referring Certain Matters for Investigation, 120 FERC ¶ 61,024, at ¶ 17 (July 6, 2007).

The rationale behind the filed rate doctrine applies with equal force to an MBR auction system such as NYISO's in which the regulating agency tightly controls the auction process and has exercised its ability to undertake individual review of the MBR to ensure that anti-competitive practices did not undermine the

25

process it created.  FERC employed a bid cap to curb the market power of large firms and created a mechanism to investigate and rectify fraudulent market manipulation.  For a federal court to intrude into FERC's carefully constructed system would directly undermine the rationale of the filed rate doctrine.  It would permit courts "to grant . . . greater relief than [plaintiffs] could obtain from the Commission itself."  <u>Arkla</u>, 453 U.S. at 579.  FERC's auction process was plainly designed to result in a reasonable rate, and we are not willing to say that KeySpan's bid cap, specifically approved by FERC, was not reasonable.  We conclude that the filed rate doctrine applies on these facts – where the regulator created a process for setting rates, reviewed the resulting rates, and, after investigation, determined that the anti-competitive behavior did not undermine its process and that the resulting rates were reasonable.  There is no need for us to reach the question of whether the filed rate doctrine would apply to all MBRs irrespective of the oversight of the regulator, and we leave that question for another day.

## CONCLUSION

Because we conclude that Simon lacks standing to bring his federal antitrust claims and his state and federal claims are barred by the filed rate doctrine, we need not consider his challenges to the district court's other holdings.  Accordingly,

26

for the reasons described above, the judgment of the district court is AFFIRMED.