14-2250-cv
Rothstein v. Balboa Insurance Co.

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: May 1, 2015     Decided: July 22, 2015)

Docket No. 14-2250-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

LANDON ROTHSTEIN, individually and on
behalf of all others similarly situated, ROBERT
DAVIDSON, IHOR KOBRYN, individually and
on behalf of all others similarly situated,
JENNIFER DAVIDSON,

Plaintiffs-Appellees,

- v.-

BALBOA INSURANCE COMPANY, NEWPORT
MANAGEMENT CORPORATION, MERITPLAN
INSURANCE COMPANY,

Defendants-Appellants,

GMAC MORTGAGE, LLC, f/k/a GMAC
MORTGAGE CORPORATION, GMAC
INSURANCE MARKETING, INC., d/b/a GMAC
AGENCY MARKETING, JOHN DOES 1-20,
ALLY FINANCIAL, INC., f/k/a GMAC, INC.,
ALLY BANK, f/k/a GMAC BANK, JOHN DOE

CORPORATION, PRAETORIAN INSURANCE
COMPANY, QBE FIRST INSURANCE AGENCY,
INC., QBE INSURANCE CORPORATION, QBE
SPECIALTY INSURANCE COMPANY,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:                    JACOBS, HALL, and LYNCH, Circuit Judges.

Defendants Balboa Insurance Company, Newport Management

Corporation, and MeritPlan Insurance Company appeal from the order of the

United States District Court for the Southern District of New York (Nathan, J.),

denying in part their motion to dismiss. The plaintiffs, borrowers who failed to

maintain hazard insurance on their mortgaged properties, claim that they were

overcharged by their loan servicer for lender-placed insurance sold by the

defendants. We conclude that the claims are barred by the filed rate doctrine.

Reversed and remanded.

<div style="margin-left:50%">

ROSS E. MORRISON (Robyn C. Quattrone
and Katherine L. Halliday, BuckleySandler
LLP, Washington, D.C., John C. Englander,
Goodwin Procter LLP, Boston,
Massachusetts, Brian T. Burgess, Goodwin
Procter LLP, Washington, D.C., on the
brief), BuckleySandler LLP, New York,
New York, for Defendants-Appellants.

</div>

MARK A. STRAUSS (Thomas W. Elrod, on the brief), Kirby McInerney LLP, New York, New York, for Plaintiffs-Appellees.

Frank G. Burt, Denise A. Fee, W. Glenn Merten, and Brian P. Perryman, Carlton Fields Jorden Burt, P.A., Washington, D.C., for Amicus Curiae American Security Insurance Company.

DENNIS JACOBS, Circuit Judge:

Plaintiffs are borrowers who failed to purchase hazard insurance on their mortgaged properties, as required by the terms of their loan agreements. Their loan servicer, GMAC Mortgage LLC ("GMAC"), bought lender-placed insurance ("LPI") from Balboa Insurance Company and MeritPlan Insurance Company (together, "Balboa") at rates that were approved by regulators. GMAC then sought reimbursement from Plaintiffs at those same rates.

Plaintiffs allege that they were fraudulently overbilled because the rates they were charged did not reflect secret "rebates" and "kickbacks" that GMAC received from Balboa through Balboa's affiliate, Newport Management Corporation ("Newport"). They sued GMAC and various affiliates, Balboa, and Newport in the United States District Court for the Southern District of New York (Nathan, J.), alleging, inter alia, claims under the Racketeer Influenced and

Corrupt Organizations Act ("RICO") and the Real Estate Settlement Procedures Act ("RESPA"). The claims against all defendants except Balboa and Newport were settled.

Balboa and Newport moved to dismiss under the filed rate doctrine, arguing that Plaintiffs could not sue to challenge LPI rates approved by regulators. The district court denied the motion in relevant part, reasoning that although Balboa received regulatory approval for the LPI rates it charged to GMAC, that approval did not necessarily extend to the borrowers' reimbursement to GMAC. Noting a conflict of authority on this issue, the court certified its decision for interlocutory appeal.

We hold that a claim challenging a regulator-approved rate is subject to the filed rate doctrine whether or not the rate is passed through an intermediary. The claim is therefore barred if it would undermine the regulator's rate-setting authority or operate to give the suing ratepayer a preferential rate. Applying this analysis, we conclude that Plaintiffs' claims are barred and, accordingly, reverse and remand for dismissal of the case.

**BACKGROUND**

The purchase of residential property is often financed through a mortgage loan secured by the subject property. Until repayment of the loan, the lender holds a security interest in the property (i.e., the mortgage) in the unpaid amount. To mitigate the risk that the mortgaged property will be damaged or destroyed before the loan is repaid, the lender can require the borrower to maintain hazard insurance sufficient to cover the lender's interest.

In a typical mortgage loan arrangement, if the borrower fails to maintain adequate hazard insurance, the lender can purchase insurance on the borrower's behalf and then seek reimbursement from the borrower. Such lender-placed insurance, or LPI, can be more expensive than ordinary hazard insurance and does not necessarily cover the borrower's interest in the property.

Lenders seldom hold or manage individual mortgage loans. Such loans are typically securitized through the transfer of title to a trust that pools the loans together and issues securities backed by the mortgages in the pool ("residential mortgage-backed securities"). The trust also contracts with a loan servicer, such as GMAC, to service the loans on a day-to-day basis. Among other responsibilities, the servicer must ensure that borrowers maintain contractually

5

required hazard insurance and, if necessary, the servicer must purchase LPI from an insurer, such as Balboa.

Plaintiffs' residential properties in Texas, New Hampshire, and New York were financed with mortgage loans serviced by GMAC. Plaintiffs each signed a loan agreement requiring hazard insurance on the mortgaged property and warning that the lender would be entitled to purchase LPI if hazard insurance was not maintained. Plaintiff Landon Rothstein's agreement was typical:

> Borrower shall keep . . . the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards . . . for which Lender requires insurance. . . .
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. . . . [S]uch coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. . . .

Second Am. Compl. ¶ 48 (emphasis omitted).

Plaintiffs failed to maintain adequate hazard insurance. Consequently, GMAC acquired LPI from Balboa. Before and after the acquisition of LPI, Plaintiffs were advised in writing that they would be required to reimburse

6

GMAC for the cost of LPI. GMAC bought LPI from Balboa at rates approved by state insurance regulators.[1] See Tex. Ins. Code § 2251.152; N.H. Rev. Stat. § 412:16(XII); N.Y. Ins. Law. § 2314. GMAC then sought reimbursement from Plaintiffs at those same rates.

Plaintiffs allege that the amounts billed by GMAC were inflated because they did not reflect hidden "rebates" that GMAC received from Balboa through a "kickback scheme." Second Am. Compl. ¶¶ 67-72. The alleged scheme is that GMAC agreed to buy LPI exclusively from Balboa and, in return, Balboa agreed to provide GMAC with loan tracking services through an affiliate, Newport. The services performed by Newport--including the identification of borrowers who defaulted on the duty to obtain hazard insurance--offset GMAC's expenses by relieving GMAC of the obligation to do those things itself. Because Balboa provided Newport's services as a quid pro quo for GMAC's LPI business, Plaintiffs characterize Newport's services as, in effect, a discount on LPI from the filed rates approved by regulators. Since GMAC still billed Plaintiffs at the filed rates, it retained for itself the entire benefit of that discount.

---

[1]  Those regulators are the Texas Department of Insurance, the New Hampshire Insurance Department, and the New York State Department of Financial Services.

In April 2012, Plaintiffs filed a complaint against GMAC and affiliated entities, Balboa, and Newport, on behalf of a putative class of mortgage loan borrowers who were charged for LPI by GMAC. When GMAC filed for Chapter 11 bankruptcy a month later, Plaintiffs withdrew their suit as to GMAC and filed claims in bankruptcy. Plaintiffs and GMAC later reached a settlement in principle resolving claims against GMAC (and certain affiliates) in exchange for a $13 million unsecured claim in favor of Plaintiffs and the putative class in the bankruptcy. Only the claims against Balboa and Newport are at issue in this appeal.

The relevant complaint--the Second Amended Complaint filed in January 2013--alleges substantive and conspiracy claims under RICO based on predicate acts of wire fraud, mail fraud, and extortion, as well as a RESPA claim.[2] Balboa and Newport moved to dismiss, arguing that the claims were barred by the filed rate doctrine and, moreover, inadequately pleaded.

The district court granted the motion in part and denied it in part. The court: (1) rejected the argument that the filed rate doctrine barred the claims,

_____

[2] Plaintiffs have since filed a Third Amended Complaint not materially different from the Second Amended Complaint.

8

(2) concluded that the RICO claims were adequately pleaded, and (3) dismissed the RESPA claim as inadequately pleaded. Rothstein v. GMAC Mortg., LLC, No. 12 Civ. 3412 (AJN), 2013 WL 5437648, at *20 (S.D.N.Y. Sept. 30, 2013). The court concluded that the filed rate doctrine did not apply because Plaintiffs were not direct customers of the rate filer, Balboa. Id. at *6-9. It observed, however, that the issue was a close call and that there was no direct case law in this circuit and conflicting authority elsewhere. Id.; see also Rothstein v. GMAC Mortg., LLC, No. 12 Civ. 3412 (AJN), 2014 WL 1329132, at *2 (S.D.N.Y. Apr. 3, 2014).

Balboa and Newport's motion for interlocutory appeal was granted.[3] The principal issue on appeal--and the only issue we decide--is whether the filed rate doctrine bars Plaintiffs' claims.

## DISCUSSION

We review de novo the denial of a motion to dismiss under Rule 12(b)(6). Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 235 (2d Cir. 2006).

---

[3]    American Security Insurance Co. filed an amicus curiae brief in support of Balboa and Newport.

9

# I

Under the filed rate doctrine, "any 'filed rate'--that is, one approved by the governing regulatory agency--is per se reasonable and unassailable in judicial proceedings brought by ratepayers." Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994). The doctrine is grounded on two rationales: first, that courts should not "undermine[] agency rate-making authority" by upsetting approved rates (the principle of "nonjusticiability"); and, second, that litigation should not become a means for certain ratepayers to obtain preferential rates (the principle of "nondiscrimination"). Marcus v. AT&T Corp., 138 F.3d 46, 58, 61 (2d Cir. 1998); see generally Keogh v. Chi. & Nw. Ry. Co., 260 U.S. 156 (1922).

The doctrine reaches both federal and state causes of action and protects rates approved by federal or state regulators. Wegoland, 27 F.3d at 20. Its application does not "depend on the nature of the cause of action the plaintiff seeks to bring" or "the culpability of the defendant's conduct or the possibility of inequitable results." Marcus, 138 F.3d at 58. Whenever a ratepayer's claim against a rate filer would implicate either the nonjusticiability principle or the nondiscrimination principle, it is barred. Id. at 59.

10

## II

It is undisputed that Balboa's LPI rates were filed with regulators and that Plaintiffs were billed at those same rates by GMAC. We therefore ask whether Plaintiffs' claims would offend either the nonjusticiability principle or the nondiscrimination principle. Marcus, 138 F.3d at 59. We conclude that both principles bar the claims.

## A

The nonjusticiability principle arises out of the recognition that--unlike regulators, who "employ their peculiar expertise to consider the whole picture regarding the reasonableness of a proposed rate"--courts are "simply ill-suited" to decide whether a rate is appropriate. Wegoland, 27 F.3d at 21. Accordingly, courts must not "systematically second guess the regulators' decisions and overlay their own resolution." Id. The doctrine "prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority." Marcus, 138 F.3d at 61. Thus, a claim may be barred even if it can be characterized as challenging something other than the rate itself. Id.; see also Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 489 (2d Cir. 1998) (rejecting plaintiff's "attempts to recharacterize its argument in order to

11

avoid the harsh inequities occasioned by application of the filed rate doctrine");

Wegoland, 27 F.3d at 21 ("The fact that the remedy sought can be characterized as damages for fraud does not negate the fact that the court would be determining the reasonableness of rates." (emphasis and internal quotation marks omitted)).

Plainly, Plaintiffs' claims would undermine the rate-making authority of the state insurance regulators who approved Balboa's LPI rates. The theory behind the claims is that Plaintiffs were overbilled when they were charged the full LPI rates (which were approved by regulators), instead of lower rates net of the value of loan tracking services provided by Newport.[4] That theory can succeed only if the arrangement with Newport should have been treated as part and parcel of the LPI transaction and *reflected in the LPI rates*. But, under the nonjusticiability principle, it is squarely for the regulators to say what should or should not be included in a filed rate. Wegoland, 27 F.3d at 21.

---

[4] Notwithstanding their use of the pejorative "kickback," Plaintiffs do not appear to argue that it was illegal for Balboa to render services without charge to GMAC. It is hardly uncommon for insurers to render policyholders free services, such as inspections, appraisals, and so forth.

12

The parallel with <u>Wegoland</u> is instructive. The <u>Wegoland</u> plaintiffs alleged that the rate filers bought certain products and services from their own subsidiaries at artificially inflated prices, and then relied on the inflated prices to obtain regulatory approval of higher rates to consumers. 27 F.3d at 18. As in this case, the plaintiffs argued that the filed rate doctrine did not bar their claims because they were attacking the fraudulent scheme, not the rates themselves. <u>Id.</u> at 21. We rejected that argument: "'[A]ny attempt to determine what part of the rate previously deemed reasonable was a result of the fraudulent acts would require determining what rate would have been deemed reasonable absent the fraudulent acts, and then finding the difference between the two.'" <u>Id.</u> (quoting <u>Wegoland, Ltd. v. NYNEX Corp.</u>, 806 F. Supp. 1112, 1121 (S.D.N.Y. 1992)).

Plaintiffs' claims in this appeal likewise rest on the premise that the rates approved by regulators were too high. After all, if Balboa was willing to offer a "discount" from the filed rates (through the free services it provided via Newport), those rates must have been inflated in the first place. But whether insurer-provided services should have been reflected in the calculation of LPI is not for us to say; under the nonjusticiability principle, the question is reserved exclusively to the regulators. <u>Cf.</u> <u>Ark. La. Gas Co. v. Hall</u>, 453 U.S. 571, 578-79

13

(1981) ("[T]he award of a retroactive rate [adjustment] based on speculation about what the [regulator] might have done had it been faced with the facts of this case . . . is precisely what the filed rate doctrine forbids."); Wegoland, 27 F.3d at 21 ("Apart from participating in the political process and filing complaints with the regulatory agencies, individual ratepayers simply have no role in attacking the reasonableness of filed rates. Nor is there room for judicial intervention in such a case.").

Indeed, one of the regulators cited in Plaintiffs' complaint--the New York State Department of Financial Services--has already investigated the provision of loan tracking services by LPI insurers, and adopted a regulation restricting the practice. N.Y. Comp. Codes R. & Regs. tit. 11 § 227.0(c) (2015) ("The department's investigation found that insurers offered financial incentives to mortgage servicers and their affiliates . . . . In addition, one insurer provided force-placed insurance on mortgages serviced by an affiliate of the insurer. . . . Section 227.6 of this Part prohibits these practices."). Other regulators may wish to follow suit, or not. Either way, judicial endorsement of Plaintiffs' claims would displace and distort the regulatory process.

14

Thus Plaintiffs' claims invite judicial meddling in issues of insurance policy. Because that is forbidden under the principle of nonjusticiability, the claims are barred.

**B**

Plaintiffs' claims also offend the nondiscrimination principle, under which challenges to filed rates are barred if "allowing individual ratepayers to attack the filed rate would undermine the . . . scheme of uniform rate regulation." Wegoland, 27 F.3d at 19 (internal quotation marks omitted). The nondiscrimination principle, like the principle of nonjusticiability, applies even to claims that purport to seek relief other than a lower rate. See Keogh, 260 U.S. at 163.

Any damages recovered by these Plaintiffs would operate "like a rebate . . . to give [them] a preference" over other borrowers who were charged for LPI. Keogh, 260 U.S. at 163. While non-suing borrowers serviced by GMAC would be billed at the filed LPI rates, Plaintiffs would enjoy the discount that Newport allegedly provided to GMAC. The problem is not obviated simply because Plaintiffs have brought their claims on behalf of a putative class. Sun City Taxpayers' Ass'n v. Citizens Utils. Co., 45 F.3d 58, 62 (2d Cir. 1995) ("[T]he filed

15

rate doctrine applies whether or not the plaintiffs are suing for a class." (internal quotation marks omitted)); see also Marcus, 138 F.3d at 61 ("[N]ondiscrimination concerns remain viable even in the context of a class action lawsuit.").

Accordingly, Plaintiffs' claims are barred by the filed rate doctrine for the separate--and independently sufficient--reason that they would result in Plaintiffs paying preferential rates for LPI.

### III

The district court did not undertake the usual analysis under the principles of nonjusticiability and nondiscrimination. Instead, the court held that the filed rate doctrine does not apply at all because the doctrine addresses only "a simple A-to-B transaction--in which A, the insurer, approved a rate and charged it to B," not the "A-to-B-to-C" arrangement at issue here, in which the insurer billed the lender and the lender in turn billed the borrower. Rothstein, 2013 WL 5437648, at *8-9.

We respectfully disagree. The filed rate doctrine is not limited to transactions in which the ratepayer deals directly with the rate filer. The doctrine operates notwithstanding an intermediary that passes along the rate.

16

**A**

We have applied the filed rate doctrine to claims by ratepayers who pay the filed rate through an intermediary. Thus the doctrine was held to bar claims by "a retail consumer of electricity" against "a producer of electricity." Simon v. KeySpan Corp., 694 F.3d 196, 198 (2d Cir. 2012). The defendant (the rate filer) sold electricity to a retail seller, which in turn sold to consumers, including the plaintiff Simon; Simon alleged that the rate filer colluded with another producer to manipulate the rate-setting process. Id. at 198-99. We held that the claims were barred because the rates were determined through a regulator-approved auction process, and the regulator found no market manipulation. Id. at 208. In reaching that result, we attributed no significance to Simon's purchase of the electricity through an intermediary; it was enough that he sued the rate filer and sought to challenge the filed rate. Id. at 204-08; accord Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1226 (9th Cir. 2007) ("But, argues [the plaintiff], its actions differ from others we have considered because it did not directly purchase wholesale power. Rather, it was a retail customer. That is an

17

asthenic [i.e., weak] distinction at best.").[5]

Nor is there some evident reason why the doctrine should be limited to direct transactions between the ratepayer and the rate filer. The principles of nonjusticiability and nondiscrimination have undiminished force even when the rate has passed through an intermediary.

As discussed, the nonjusticiability principle is motivated by the concern that "[a]s compared with the expertise of regulating agencies, courts do not approach the same level of institutional competence to ascertain reasonable rates." Wegoland, 27 F.3d at 21. A court is confronted with a single case, whereas a regulator can "consider the whole picture" and "make hundreds if not thousands of discretionary decisions" about overall industry regulation. Id. And in many industries (such as the energy industry in Simon and Wah Chang as well

---

[5] Plaintiffs cite a number of cases for the principle that a filed rate governs only the transaction "covered" by the rate. E.g., FTC v. Verity Int'l, Ltd., 443 F.3d 48, 62 (2d Cir. 2006) ("We hold that the filed-rate doctrine does not apply in this case because the defendants-appellants point to no tariff that covers the actual service rendered to users of their billing system."); Fla. Mun. Power Agency v. Fla. Power & Light Co., 64 F.3d 614, 616 (11th Cir. 1995) ("If the gravamen of the Agency's claim that the two services are distinct and there is no filed network rate is accurate, then it is clear the doctrine would not confer immunity."). Those cases stand for the unremarkable proposition that the approved rate for one product cannot be invoked as to a different (unregulated) product. Here, there is a single (regulated) product, LPI, that is routed through an intermediary.

18

as the LPI industry here), the rate-regulated product necessarily passes through intermediaries before the rate is paid by the ultimate consumer. In such industries, it would make little sense for the doctrine to apply as between the rate filer and the intermediaries, but not when it comes to the ultimate ratepayers.

The nondiscrimination principle avoids the risk that litigation over filed rates would become a means of obtaining preferential rates, as "victorious plaintiffs would wind up paying less than non-suing ratepayers." Wegoland, 27 F.3d at 21; see also Keogh, 260 U.S. at 163. That concern is just as valid when the ratepayer deals with an intermediary. See Simon, 694 F.3d at 201.

**B**

The distinction between an "A-to-B" transaction and an "A-to-B-to-C" transaction is especially immaterial in the LPI context because LPI travels invariably "A-to-B-to-C." The purpose of LPI is to enforce the borrower's contractual obligation to maintain adequate hazard insurance; the lender acts on the borrower's behalf and in the borrower's place to "force place" a transaction that the borrower should have entered.[6] Second Am. Compl. ¶¶ 46-48 (internal

---

[6] However, the risk calculation in the hazard insurance context may differ from the calculation in the LPI context. For this reason, LPI often costs more than ordinary hazard insurance.

quotation marks omitted). There are three participants in the transaction (insurer, lender, borrower), but the lender is a go-between that connects the insurer (the party selling insurance) to the borrower (the party actually paying for it). Thus LPI is an A-to-B-to-C transaction that implements a two-party transaction between the insurer and the borrower.

Plaintiffs postulate that the lender need not act as a pass-through, and could theoretically decouple its purchase of LPI from its demand of reimbursement, for example, by charging the borrower twice (or half) the filed rate. However, Plaintiffs do not explain how any such action by the *lender* could result in liability for the *insurer*, which would (under any such arrangement) still be legally compelled to charge the filed rate. In any event, no such facts are alleged here: according to the Second Amended Complaint, Plaintiffs were billed the "full purported price" of LPI at the rates filed by Balboa. Second Am. Compl. ¶¶ 69, 110.

## C

The district court interpreted Balboa's insurance filings to suggest that LPI rates were approved for imposition on lenders, but not on borrowers: "[T]he lender pays the insurer for all premium and charges back only those parts of the

20

premium which are allowed to be charged to the borrower." Rothstein, 2013 WL

5437648, at *8 (quoting Balboa's New Hampshire filing). But the context matters:

> This insurance is to cover real property when it is required by the Mortgage Contract between the lender and the borrower. That agreement does not allow the lender to require a borrower to pay for coverage on items not mortgaged to secure the loan or for coverage that exceeds the coverage required in amount or peril by the mortgage contract. *This program is designed so that the lender pays the insurer for all premium and charges back only those parts of the premium which are allowed to be charged to the borrower.*

A. 595 (emphasis added). The word "allowed" references the allowable scope of

*coverage* (which must exclude "items not mortgaged to secure the loan" and

"coverage that exceeds the coverage required in amount or peril by the mortgage

contract"); it does not, as the district court believed, prevent the lender from

passing on the full LPI rates (on allowed coverage) to the borrower. If anything,

the quoted sentence suggests that the New Hampshire regulators expressly

contemplated that the approved LPI rates would be "charged to the borrower."

Similarly, there is no question that Texas and New York insurance

regulators were well aware that approved LPI rates would be fully borne by

borrowers. See Tex. Dep't of Ins., Consumer Alert: Force Placed Coverage,

available at http://www.tdi.texas.gov/consumer/documents/forceplaced.pdf ("If

21

you cancel or lose these insurance coverages, your lender will buy an insurance policy--often called forced placed coverage--and *add the cost to your loan payment*." (emphasis added)); N.Y. Comp. Codes R. & Regs. tit. 11 § 227.0(c) ("In addition, one insurer provided force-placed insurance on mortgages serviced by an affiliate of the insurer. These practices . . . artificially inflated *premiums charged to homeowners*." (emphasis added)).

Thus the quintessentially "A-to-B-to-C" character of LPI transactions was known to the regulators who approved Balboa's rates.

## CONCLUSION

For the foregoing reasons, we reverse and remand for dismissal of the case.