BOGGS, Circuit Judge:
When an individual takes out a mortgage, he or she secures the loan with real property. To protect its security interest, lenders usually require borrowers to maintain *1317 hazard insurance in an amount that is at least equal to the loan's unpaid principal balance. Should a borrower fail to obtain or maintain adequate coverage, the mortgage may authorize the lender to purchase insurance for the property and to charge the borrower for the cost of coverage. Such coverage is known as "force-placed insurance" ("FPI") or "lender-placed insurance." Typically, the task of monitoring borrowers' insurance coverage-and force-placing it when necessary-is farmed out to a loan servicer.
The plaintiffs in these consolidated cases are borrowers who allege that their mortgage servicers, Specialized Loan Servicing, LLC ("SLS") and Caliber Home Loans, Inc. ("Caliber"),[1] breached the plaintiffs' loan contracts, as well as an implied covenant of good faith and fair dealing, by charging "inflated amounts" for FPI. Specifically, the plaintiffs claim that SLS and Caliber received "rebates" or "kickbacks" from the force-placed insurer, American Security Insurance Company ("ASIC"), but that they did not pass these savings on to the borrowers. As such, the plaintiffs allege that SLS and Caliber violated the terms of the mortgage contracts, which authorized the servicers to charge only for the "cost of the insurance." In the alternative to these contractual claims, the plaintiffs pleaded an unjust-enrichment claim against the servicers.
Additionally, because the plaintiffs claim that SLS and Caliber colluded with ASIC to disguise the alleged overcharges as legitimate expenses, they also accuse SLS and Caliber of violating the Federal Truth in Lending Act, 15 U.S.C. § 1601 ; ASIC of tortious interference with a business relationship and unjust enrichment; and all three companies of violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), (d). Patel and Wilson further allege that SLS's actions violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201.
Complicating this otherwise run-of-the-mill contract dispute is the fact that ASIC's FPI rates have been filed with, and approved by, state regulators in the relevant jurisdictions.[2] Because of this, the possibility arises that the plaintiffs' claims are barred by the filed-rate doctrine, which, inter alia, "precludes any judicial action which undermines agency rate-making authority." Hill v. BellSouth Telecomms., Inc. , 364 F.3d 1308, 1317 (11th Cir. 2004) (quoting Marcus v. AT&T Corp. , 138 F.3d 46, 61 (2d Cir. 1998) ). The issue before us now is whether the plaintiffs' claims are so barred.
Because we conclude that the plaintiffs, in their complaints, challenge a rate filed with regulators, we hold that the filed-rate doctrine applies. We accordingly affirm the district courts' dismissals of the cases under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.
I
A
In June 2005, Pankaj Patel, a Florida citizen, signed a mortgage agreement with nonparty IndyMac Bank, which required him to maintain hazard insurance on the subject property for the life of the loan. In pertinent part, the agreement stated:
5. Property Insurance . Borrower shall keep the improvements now existing or *1318 hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. ...
If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard[,] or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.
...
9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument . If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture...), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.
Patel Compl., Exhibit A, at 5-7.
In June 2014, Patel's voluntary coverage lapsed. Shortly thereafter, ASIC-with whom SLS had subcontracted to monitor its loan portfolio-sent Patel a letter informing him that if proof of coverage was not provided, SLS would purchase insurance on his behalf. The notice advised Patel of his right to obtain coverage from an insurance agent or company of his choice, "urge[d] [him] to do so," informed him that insurance bought by SLS was "likely" to have a "much higher" cost and to provide less coverage than what he could obtain on his own, and stated that "[t]he insurance we obtain may provide benefits to you but is primarily for the benefit of SLS."[3] ASIC Motion to Dismiss, Exhibit 1, at 4-5 (No. 0:15-cv-62600-JIC). It further disclosed that "if [SLS] purchase[d *1319 the] insurance ..., an affiliate of SLS [could] benefit" by receiving a commission and that "[t]he insurance company may factor such commission into the rate charged for the coverage." Id. at 5. The notice closed by "strongly recommend[ing]" that Patel obtain his own coverage.
One month later, SLS sent Patel a second notice, stating that it still had not received evidence of insurance. This letter included an insurance binder that disclosed the annual premium of the policy that SLS would purchase if it did not receive proof of coverage. On August 22, 2014, after Patel had yet again failed to provide proof of the contractually-required insurance, ASIC issued a one-year FPI certificate for the property, effective from June 2014. The policy "authorized [SLS] to advance all funds to be recovered from the borrower for the insurance afforded[.]" ASIC Motion to Dismiss, Exhibit 3, at 12 (No. 0:15-cv-62600-JIC). On June 5, 2015, Patel obtained voluntary coverage.
Patel's experience is representative of that of the remaining plaintiffs. Wilson, Fowler, and Yambo-Gonzalez are Florida citizens whose mortgage contracts contained provisions that were identical to those quoted above, while Keller, a Pennsylvania citizen, signed a mortgage contract containing materially similar provisions.[4] Each also received at least one notice from his or her servicer, which stated that hazard insurance would be force-placed if voluntary coverage was not obtained and that the cost of FPI was likely to be "much higher" or "substantially higher" than the cost of insurance that he or she could obtain on his or her own. Keller, for instance, received two letters warning that the cost of insurance bought by Caliber was "likely to be much higher than the cost of coverage [she] could obtain on [her] own" and that "OBTAINING [HER] OWN INSURANCE [WAS] IN [HER] BEST INTEREST." ASIC Motion to Dismiss, Exhibits C-1 and C-2 (No. 1:15-cv-24542-JG). When the plaintiffs failed to heed these various warnings, their respective servicers force-placed insurance. Furthermore, Wilson, Fowler, and Yambo-Gonzalez were informed, in writing, that were the servicer to purchase insurance on their behalf, an affiliate could earn commissions or income from the transaction. Finally, like Patel, Fowler and Keller received insurance certificates containing provisions that authorized their servicers to "advance all funds to be recovered from the borrower for the insurance afforded[.]"[5] ASIC Motion to Dismiss, Exhibits A-3 and C-3 (No. 1:15-cv-24542-JG).
*1320 B
At the time that insurance was force-placed on the plaintiffs, ASIC was the exclusive provider of FPI for SLS and Caliber. As part of this arrangement, prior to any lapse in the plaintiffs' hazard insurance, ASIC had already issued a master insurance policy to each servicer that covered the entirety of its mortgage-loan portfolio. In exchange, ASIC performed many of SLS's and Caliber's loan-servicing functions. Most notably, ASIC and its affiliates monitored SLS's and Caliber's loan portfolio for lapses in borrowers' insurance coverage, and once a lapse was identified, ASIC sent the borrower a notice-on either SLS's or Caliber's behalf-informing him or her that insurance would be force-placed if voluntary coverage was not obtained. If the lapse continued, ASIC then issued an insurance certificate, at the borrower's expense, based on the already-existing master policy.
Once coverage was issued, two further transactions occurred. First, the servicer paid ASIC for the insurance certificate, for which it then billed the borrower. Second, ASIC paid the servicers, or their affiliates, either a fee related to the placement of the coverage or premiums for the servicers' reinsurance of the FPI policy.
On December 10, 2015, Patel and Wilson filed a class-action complaint against SLS and ASIC, alleging that in exchange for an exclusivity agreement, ASIC provided "kickbacks" to SLS in the form of "illusory reinsurance that carrie[d] no commensurate transfer of risk[,]" below-cost mortgage services that were unrelated to FPI, " 'expense reimbursements' allegedly paid ... for expenses ... incurred in the placement of FPI coverage notwithstanding the fact that the coverage is automatically issued pursuant to a master policy already in place[,]" and "unearned 'commissions' ... for work purportedly performed to procure individual policies when no work [was] actually performed[.]" Patel Compl. ¶ 5. In their complaint, the two also asserted that "[b]orrowers ultimately bear the cost of these kickbacks [because] SLS and ASIC bundle the costs into the amounts charged for insurance coverage ..., disguising the charges as legitimate by characterizing them as income earned by SLS when, in fact, they are unearned[,] unlawful profits." Ibid.
The same day, Fowler, Yambo-Gonzalez, and Keller filed a separate class-action complaint against Caliber and ASIC. The complaint's allegations are nearly identical to those in the complaint of Patel and Wilson: that in exchange for an exclusivity agreement, ASIC provided "kickbacks" to Caliber in the form of "unearned 'commissions' ... for work purportedly performed to procure individual policies[,]" " 'expense reimbursements' allegedly paid to reimburse Caliber for expenses it incurred in the placement of the force-placed insurance coverage[,]" "payments of illusory reinsurance premiums that carr[ied] no commensurate transfer of risk[,]" and "free or below-cost" mortgage services; and that the "[d]efendants attempt[ed] to disguise the kickbacks as legitimate by characterizing them as income earned by Caliber when, in fact, they [were] unearned, unlawful profits." Fowler Compl. ¶ 3.
In each case, the defendants moved to dismiss the complaint on the grounds that the plaintiffs' claims were barred by the filed-rate doctrine or, in the alternative, that each claim suffered from at least one independent defect. On April 25, 2016, citing the filed-rate doctrine, the district court dismissed Patel's and Wilson's complaint *1321 with prejudice pursuant to Rule 12(b)(6). Patel v. Specialized Loan Servicing, LLC , 183 F.Supp.3d 1238, 1244 (S.D. Fla. 2016). Then, on July 8, 2016, the court dismissed Fowler's, Yambo-Gonzalez's, and Keller's complaint with prejudice on the same ground. Two months later, the district court issued an amended order in response to a request for clarification from the plaintiffs. Fowler v. Caliber Home Loans, Inc. , 277 F.Supp.3d 1324, 1326 n.1 (S.D. Fla. 2016).
Both sets of plaintiffs filed timely appeals. Citing the cases' similarities-namely, that they were filed on the same day in the same court by the same counsel, have a common co-defendant, and involve nearly identical claims, defenses, and issues-ASIC and SLS filed a Motion to Consolidate Appeals for Oral Argument. On December 19, 2016, we granted that motion.
II
We review de novo a district court's grant of a motion to dismiss for failure to state a claim. Allen v. USAA Cas. Ins. Co., 790 F.3d 1274, 1277 (11th Cir. 2015). In doing so, we "accept[ ] the [factual] allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army , 556 F.3d 1153, 1155 (11th Cir. 2009). However, while we are required to accept all factual allegations as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation." Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Papasan v. Allain , 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ).
To survive a Rule 12(b)(6) motion to dismiss, a complaint need not provide detailed factual allegations. Twombly , 550 U.S. at 555, 127 S.Ct. 1955. However, dismissal is appropriate "where it is clear [that] the plaintiff can prove no set of facts in support of the claims in the complaint." Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist. , 992 F.2d 1171, 1174 (11th Cir. 1993). For this reason, a court may dismiss a complaint pursuant to Rule 12(b)(6) on a dispositive issue of law. Ibid.
III
A
The filed-rate doctrine "forbids a regulated entity [from] charg[ing] rates for its services other than those properly filed with the appropriate ... regulatory authority." Hill , 364 F.3d at 1315 (quoting Ark. La. Gas Co. v. Hall , 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) ). As a result, "[w]here the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer 'can claim no rate as a legal right that is other than the filed rate[.]' " Taffet v. Southern Co. , 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (quoting Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co. , 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951) ). This holds true even "where a regulated entity allegedly has defrauded an administrative agency to obtain approval of a filed rate" or where the rate filed with the agency resulted from price-fixing. Taffet , 967 F.2d at 1489, 1494-95. Furthermore, "the filed[ ]rate doctrine applies whether the rate in question is approved by a federal or state agency." Id. at 1494 (quoting H.J. Inc. v. Nw. Bell Tel. Co. , 954 F.2d 485, 494 (8th Cir. 1992) ).
Two rationales underlie the doctrine. The first, which is known as the "nondiscrimination principle," is that all rate-payers should be charged the same rate for the regulated entity's service. See Hill , 364 F.3d at 1316. The second, which is termed the "nonjusticiability principle," is that duly-empowered administrative *1322 agencies should have exclusive say over the rates charged by regulated entities because agencies are more competent than the courts at the ratemaking process. Ibid . These two principles are "applied strictly," meaning that the filed-rate doctrine bars "a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand ... is implicated by the cause of action the plaintiff seeks to pursue." Ibid. (emphasis added) (quoting Marcus , 138 F.3d at 59 ).
The filed-rate doctrine therefore precludes two types of suits. First, and most obviously, direct challenges to a filed rate are barred because, if successful, they necessarily violate the nonjusticiability principle. See Hill , 364 F.3d at 1317. Second, facially-neutral challenges-i.e., any cause of action that is not worded as a challenge to the rate itself-are barred when an award of damages "would, effectively, change the rate paid by the customer-[plaintiff] to one below the filed rate paid by other customers" or "would, in effect, result in a judicial determination of the reasonableness of that rate[.]" Id . at 1316-17.
An important, though heretofore overlooked, corollary of the nondiscrimination and nonjusticiability principles is that the filed-rate doctrine's applicability does not turn on whether the plaintiff is a rate-payer. On the one hand, because the nonjusticiability principle does not rest on the plaintiff's identity-it bars any suit that would challenge the rate-making authority of the appropriate regulatory body-it can preclude causes of action brought by non-rate-payers. Even non-customers, for instance, cannot directly challenge a filed rate. On the other hand, even when the plaintiff is a rate-payer, the nonjusticiability and nondiscrimination principles are not always implicated. Were a rate-payer to challenge a regulated entity's practice of giving other, favored rate-payers a rebate, such a challenge would not necessarily involve the courts in rate-making; nor would it necessarily grant a subgroup of customers a discount on their rate . See, e.g. , Williams v. Duke Energy Int'l, Inc. , 681 F.3d 788, 797 (6th Cir. 2012) (holding that filed-rate doctrine does not bar rate-payers from challenging payments allegedly made by regulated entity to large customers in exchange for their withdrawing objections to proposed rate change, where defendants presented no evidence that side agreements were filed with any agency). Rather, for these principles to be implicated, the suit must challenge, either directly or indirectly, some component of the approved rate.
This observation disposes of two points of confusion that attend challenges to FPI practices such as those present here, i.e., where an intermediary passes the cost of regulator-approved rates on to a third party. First, it demonstrates that we need not debate whether the FPI transaction consists of two, separate transactions-first, between the insurers and servicers and, second, between the servicers and the borrowers-or a single "A-to-B-to-C" transaction, where the servicers are merely a conduit between the insurers and the borrowers. Such a distinction matters only if the filed-rate doctrine's applicability turns on a plaintiff's status as a rate-payer.[6]
*1323 Second, it shows that the size of the alleged "kickback" is irrelevant to the issue before us. Even were an insurer to return 100 percent of the approved premium to the servicer, the question would remain whether such a payment was a component of the rate filed with regulators. If so, the nonjusticiability doctrine precludes the cause of action. At best, then, the size of a "kickback" can only provide circumstantial evidence that the payment was not a component of the filed rate.[7]
Also overlooked is the fact that while the nondiscrimination principle is a rationale for the filed-rate doctrine, it does not determine the doctrine's applicability. If the plaintiff is not a rate-payer, then an award of damages cannot effectively change the rate paid by a subset of rate-payers. As such, because the nondiscrimination principle cannot be implicated, the nonjusticiability principle alone determines whether the filed-rate doctrine applies to such cases. At the same time, the nondiscrimination principle does not bar all suits that would lead to an award of damages to a rate-payer. A utility customer, for instance, is not barred from suing for damages done to his property by the utility company's employees. Thus, for the nondiscrimination principle to apply, the cause of action must have a connection with the rate of service. However, when that occurs, the nonjusticiability principle is also necessarily implicated. Thus, whenever the nondiscrimination principle is violated, so is the nonjusticiability principle.
A simple framework therefore emerges for determining whether the filed-rate doctrine bars a cause of action. First, we must examine whether the complaint facially attacks a filed rate. Here, this amounts to a determination of whether the plaintiffs worded their complaints as a challenge to ASIC's rate for force-placed insurance. If they did, then their causes of action are barred. Second, if the complaint does not facially attack a filed rate, we must ask whether it implicates the nonjusticiability principle by challenging the components of a filed rate. Stated differently, we must determine whether the cause of action effectively contests the inclusion of certain charges in (or the omission of certain discounts from) a rate filed with the appropriate administrative agency. In this case, this requires us to investigate whether ASIC's FPI rates include an allowance for commissions and similar costs. Only if the answer to both inquiries is "no" is the filed-rate doctrine inapplicable.
B
Before proceeding to that inquiry, however, we pause to address the dissent's claim that we should not apply the filed-rate doctrine. Despite some suggestions to the contrary, see Dissent at 1327-28 ("The majority ... now confidently decrees that the federal filed rate doctrine is the governing rule [in Florida and Pennsylvania]"), the dissent could not mean that the filed-rate doctrine is a federal doctrine that only applies to rates approved by federal regulatory agencies. Such a view has already been rejected et dixit magna voce by a unanimous en banc panel of this court. See Taffet , 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer 'can claim no rate as a legal right that is other than the filed rate ....' This principle *1324 ... applies with equal force ... whether the rate at issue has been set by a state rate-making authority or a federal one." (first alteration in original) (citing Montana-Dakota Utils. Co. , 341 U.S. at 251, 71 S.Ct. 692 ) ). Nor is this the only circuit to hold as much. See, e.g., Rothstein v. Balboa Ins. Co. , 794 F.3d 256, 261 (2d Cir. 2015) ("The [filed-rate] doctrine reaches both federal and state causes of action and protects rates approved by federal or state regulators."); see also In re N.J. Title Ins. Litig. , 683 F.3d 451, 453 (3d Cir. 2012) (affirming the district court's dismissal of "state and federal antitrust claims against numerous New Jersey title insurance companies" on the grounds that suits were based on rates that had been filed with New Jersey's Department of Banking and Insurance and, thus, were barred by the filed-rate doctrine); H.J. Inc. , 954 F.2d at 494 ("[T]he rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency"). Presumably, then, the dissent faults this opinion for not analyzing state law to determine whether the "legislature[s of Florida and Pennsylvania] ha[ve] conferred power upon an administrative agency to determine the reasonableness of [the] rate [in question]," Taffet , 967 F.2d at 1494.
Fair enough. For that reason, we now largely reproduce the reasoning that the district court offered in Fowler , 277 F.Supp.3d at 1338-39. Before doing so, however, we begin with a brief digression-namely, a quick overview of this court's discussion in Taffet of Alabama's and Georgia's utility rate-making regimes-to help frame the ensuing Erie guess, see Erie R. Co. v. Tompkins , 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
In Taffet , we concluded that the filed-rate doctrine existed as to those state regulatory schemes due, in large part, to the legislatures' having established "elaborate administrative schemes to ensure that rates for electricity are just and reasonable for the affected utilities and for the public." 967 F.2d at 1490. With respect to Alabama's regime, we noted that the legislature had delegated to the state's public service commission ("PSC") the authority to set electric power rates and to determine what constitutes a fair rate of return; that a utility that wished to change an existing rate had to file a new rate schedule with the PSC; that upon written complaint by a rate-payer, the PSC had the duty to investigate the reasonableness of the challenged rate; that the PSC's disposition of the complaint could be appealed to the Alabama Supreme Court, but that the court's inquiry was ordinarily limited to ensuring that there was evidence to support the PSC's determination; and that Alabama courts were not permitted to substitute their judgment for that of the PSC. Id. at 1490-91. We further observed that Alabama's scheme left open a means for the PSC to compensate those who had paid excess rates in the past without undermining the PSC's authority to set reasonable rates. Id. at 1492-93. For similar reasons, we concluded that the filed-rate doctrine also applied to Georgia's scheme. Id. at 1491-94.
Florida has enacted a similar regime with respect to insurance rates. Pursuant to Fla. Stat. § 627.062, insurers "must" file with the Office of Insurance Regulation ("OIR") a "copy of rates, rating schedules, [and] rating manuals," among other things. Id. § 627.062(2)(a). The OIR is empowered to review these filings to ensure that they are not "excessive, inadequate, or unfairly discriminatory[,]" where "excessive" is defined as, inter alia , "likely to produce a profit ... which is unreasonably high in relation to the risk involved in the class of business or if expenses are unreasonably high in relation to services rendered."
*1325 Id. § 627.062(2)(b), (e). Where the OIR determines that a rate or rate change is excessive, inadequate, or unfairly discriminatory, it is directed to disapprove the rate and to compensate the relevant policyholders, id. § 627.062(h) ("The office shall [ ] order ... that premiums charged each policyholder constituting that portion of the rate above that which was actuarially justified be returned to the policyholder[.]"), or, under certain circumstances, to direct the insurer to correct the noncompliance, including by adjusting the premium, id. § 627.371(2). Furthermore, whenever an insurer wishes to change a rate, it must notify the OIR within 30 days after the effective date of the change, id. § 627.062(2)(a), after which the office reviews the rate to ensure that it is not "excessive, inadequate, or unfairly discriminatory[,]" Nat'l Council on Comp. Ins. v. Fee , 219 So.3d 172, 174 (Fla. Dist. Ct. App. 2017) (quoting Fla. Stat. § 627.062(3)(b) ).
Finally, as with Alabama's utility rate-making regime, in Florida, upon written complaint and after petitioning the insurer, "[a ]ny person aggrieved by any rate charged, rating plan, [or] rating system ... followed or adopted by an insurer" may request OIR review. Fla. Stat. § 627.371(1) (emphasis added); cf. Int'l Patrol & Detective Agency Co. v. Aetna Cas. & Sur. Co. , 419 So.2d 323, 324 (Fla. 1982). Should such an individual wish to challenge an OIR decision, he or she can appeal that decision to the Florida District Court of Appeal, see State Farm Mut. Auto. v. Gibbons , 860 So.2d 1050, 1052 (Fla. Dist. Ct. App. 2003) (stating that once administrative review pursuant to Fla. Stat. § 627.371 is complete, "the exclusive jurisdiction for judicial review is the District Court of Appeal"), "but the court shall not substitute its judgment for that of the agency on an issue of discretion[,]" Fla. Stat. § 120.68(7)(e) ; cf. Nationwide Mut. Ins. Co. v. Williams , 188 So.2d 368, 372 (Fla. Dist. Ct. App. 1966) ("This court is not and should not be burdened with the responsibility of rate-making. Insurance rate-making is a technical, complicated, and involved procedure. It is not an exact science. Judgment based upon a thorough knowledge of the problem must be applied.").
While such data points may not allow us to say with certainty that the appellate courts of Florida will hold that the filed-rate doctrine exists as to the regulatory scheme in question, they are enough to make an educated guess, which is all that Erie requires. And for similar reasons, we can make an educated guess regarding the determination of the appellate courts of Pennsylvania. See 40 Pa. Stat. Ann. § 710-6(a) ("Every insurer making a filing with the commissioner ... shall file every manual of classifications, rules and rates, every rating plan and every modification of a manual of classifications, rules and rates and a rating plan which it proposes to use[.]" (emphasis added) ); see also id. § 710-7(b) (permitting commissioner to disapprove rates that are "excessive, inadequate, or unfairly discriminatory"); Id. § 710-11(e) (permitting the commissioner to suspend a previously approved rate if it subsequently deems, inter alia , the rate to be excessive); 1 Pa. Code § 35.9 ("A person complaining of anything done or omitted to be done by a person subject to the jurisdiction of an agency, in violation of a statute or regulation administered or issued by the agency may file a complaint with the agency").
C
Although the plaintiffs assert on appeal that they are not challenging the reasonableness of ASIC's rates, the complaints belie this claim. As such, their causes of action fail at the first stage of the analysis. The most obvious basis for this conclusion is the fact that the plaintiffs *1326 repeatedly state that they are challenging ASIC's premiums. In a section of the complaints titled "The Force-Placed Insurance Scheme," they characterize the servicers as being "incentivized to purchase and force place insurance coverage with artificially inflated premiums [.]" Patel Compl. ¶ 36 (emphasis added); Fowler Compl. ¶ 35 (emphasis added); see also Patel Compl. ¶¶ 98(b), 111; Fowler Compl. ¶ 111(b). Elsewhere, they describe themselves as "suffer[ing] damages in the form of unreasonably high force-placed insurance premiums [.]" Patel Compl. ¶ 156 (emphasis added); Fowler Compl. ¶ 169 (emphasis added); see also Patel Compl. ¶¶ 150, 162. Finally, the plaintiffs make clear that they are objecting to ASIC's-not just SLS's-practice of "bundl[ing] the cost [of "kickbacks"] into the amounts charged for insurance coverage." Patel Compl. ¶ 5; see also Patel Compl. ¶¶ 38, 120; Fowler Compl. ¶¶ 37, 115, 124, 125, 150, 166(l). The plain language of the complaints therefore shows that the plaintiffs are challenging the reasonableness of ASIC's premiums; and since these premiums are based upon rates filed with state regulators, plaintiffs are directly attacking those rates as being unreasonable as well.
That the plaintiffs are challenging ASIC's rates is further attested to by their allegation that the defendants have "manipulate[d] the force-placed insurance market" to "artificially inflate the amounts ... charge[d] to borrowers" for force-placed insurance. Patel Compl. ¶ 26; Fowler Compl. ¶ 25. Since ASIC is the provider in the FPI market, the charge of price manipulation necessarily attacks ASIC's premiums. Given, moreover, that the plaintiffs repeatedly use the language of market manipulation to characterize their causes of action, Patel Compl. ¶¶ 14, 47, 75(e), 98(a), 140; Fowler Compl. ¶¶ 12, 45, 89(e), 111(a), 153(i), we cannot avoid the conclusion that they are directly challenging the rates that ASIC has filed with state regulators.
Their complaints therefore contain textbook examples of the sort of claims that we have previously held are barred by the nonjusticiability principle. In Taffet , for instance, we held that utility customers in Alabama and Georgia could not sue utilities for damages measured as the difference between the filed rate and the rate that would have prevailed absent the providers' fraudulent behavior. 967 F.2d at 1491. Permitting such a cause of action, we stated, "would disrupt greatly the states' regulatory schemes" because for the plaintiff-customers to prevail, a "trial judge, or a jury, would have to determine what rate should have been set by" the states' regulatory bodies. Ibid. Since this would effectively empower the trial court to set a new rate, the nonjusticiability principle was violated. Ibid. And as we also noted, there is no fraud exception to the filed-rate doctrine, id. at 1494-95, defeating the plaintiffs' attempt at circumventing the rule by alleging a fraudulent kickback scheme.
We reached the same conclusion in Hill , where a telecommunications customer sought monetary damages from a service provider for its billing practices, specifically, its representation of a given charge as a recoupment of a mandatory federal fee when, in fact, the charge exceeded the required fee. 364 F.3d at 1311-12. Because that charge had been filed with federal regulators, we concluded that a decision in the plaintiff's favor would amount to a retroactive determination of a filed rate's reasonableness and was thus barred. Id. at 1317. Likewise, for the plaintiffs to prevail in this case, a trial court would have to determine that ASIC's rates should have been lower than what was filed with regulators in Florida and Pennsylvania.
Because the plaintiffs should be understood as meaning what they say, we find that they have challenged ASIC's filed rate. As such, there can be no doubt that *1327 their causes of action are barred by the filed-rate doctrine.[8]
IV
For the reasons noted above, this case triggers an application of the filed-rate doctrine. We therefore AFFIRM the district courts' grants of the defendants' motions to dismiss for failure to state a claim. We DENY the October 24, 2016 motion for judicial notice by defendants-appellees Specialized Loan Servicing LLC and American Security Insurance Company as moot.

Caliber was created in 2013 when Vericrest Financial and Caliber Funding merged operations. Although this lawsuit also challenges the FPI practices of Caliber Home Loan's predecessors, for ease of exposition, we will refer to their actions as those of Caliber.

The plaintiffs do not dispute that the FPI premiums charged to and paid by the plaintiffs were not more than the insurance rates filed with, and approved by, the relevant state regulators.

"Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss." Fin. Sec. Assur., Inc. v. Stephens, Inc. , 500 F.3d 1276, 1284 (11th Cir. 2007) (per curiam). An exception exists, however, where "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." Ibid. Because the various letters and FPI policies that SLS sent to Patel and Wilson are referenced in the complaint, are central to the plaintiffs' claims, were attached to ASIC's Motion to Dismiss, and were not disputed when they were introduced below, we will consider them.
For the same reason, we will consider the notices and FPI policies that Caliber sent to Fowler, Yambo-Gonzalez, and Keller.

Keller's mortgage stated:
5. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require.
...
7. Protection of Lender's Security. If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest.
Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the contract rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.
Caliber Motion to Dismiss, Exhibit (No. 1:15-cv-24542-JG).

Between 2009, when Yambo-Gonzalez's voluntary insurance first lapsed, and June 2014, the insurance certificates that she received did not contain this provision. Beginning in June 2014, however, they did.

In Rothstein , the Second Circuit gives an alternative reason to view "[t]he distinction between an 'A-to-B' transaction and an 'A-to-B-to-C' transaction [as being] especially immaterial in the [F]PI context[.]" 794 F.3d at 265. Specifically, the Second Circuit notes that "[F]PI travels invariably 'A-to-B-to-C' " as "[t]he purpose of [F]PI is to enforce the borrower's contractual obligation to maintain adequate hazard insurance; the lender [or servicer] acts on the borrower's behalf and in the borrower's place to 'force place' a transaction that the borrower should have entered." Ibid.

Because regulators are unlikely to approve a 100-percent "kickback," its presence would suggest that it was not a component of the filed rate. However, if it were a component of the filed rate, the proper recourse for plaintiffs would be through their state's or the federal regulatory structures. See, e.g. , Taffet , 967 F.2d at 1493-94. Notably, the size of the alleged kickbacks here was only a portion of the borrowers' FPI charges.

Even were we to proceed to the second stage of the examination, it is unlikely that we would reverse the district courts' grants of the defendants' motions to dismiss. To see why, it helps to briefly discuss Rothstein .
In Rothstein , the Second Circuit held that the filed-rate doctrine barred a suit by mortgagors who claimed that they had been "fraudulently overbilled [for FPI] because the rates they were charged did not reflect secret 'rebates' and 'kickbacks' that [the loan servicer] received from [the insurer] through [the insurer's] affiliate[.]" 794 F.3d at 259. In reaching that conclusion, the court noted that:
The theory behind the claims is that Plaintiffs were overbilled when they were charged the full LPI rates (which were approved by regulators), instead of lower rates net of the value of loan tracking services provided by [the insurer's affiliate]. That theory can succeed only if the arrangement [between the loan servicer and the insurer's affiliate] should have been treated as part and parcel of the [F]PI transaction and reflected in the [F ]PI rates.
Ibid. (footnote omitted). Since under the nonjusticiability principle, "it is squarely for the regulators to say what should or should not be included in a filed rate[,]" the court concluded that the claims were barred. Id. at 262. Admittedly, unlike this case, Rothstein only dealt with claims against the insurer and the insurer's affiliate, id. at 259 ; nevertheless, because the Plaintiffs' claims here rely on the same underlying theory, Rothstein 's reasoning continues to persuade us.
The Plaintiffs insist, however, that we should instead follow Alston v. Countrywide Fin. Corp. , 585 F.3d 753 (3d Cir. 2009), which they contend is better reasoned and supports reversal of the district court opinions. Patel Br. 17; Fowler Br. 17. In Alston , the Third Circuit "briefly address[ed]" the question of whether the filed-rate doctrine barred a suit brought pursuant to Section 8(d)(2) of the Real Estate Settlement Procedures Act of 1974 ("RESPA"). 585 F.3d at 759. And according to the dissent, the Third Circuit "conclude[ed] that the plaintiffs' kickback-scheme claims did not concern a filed rate, and thus it was 'absolutely clear that the filed rate doctrine simply d[id] not apply.' " See Dissent at 1339 (alterations in original) (quoting Alston , 585 F.3d at 765 ).
It is far from certain, however, that this is what Alston actually held. While it is true that the Third Circuit stated that it is "absolutely clear that the filed rate doctrine simply does not apply here[,]" immediately preceding that statement, it said, "[i]t goes without saying that if we were to find that the filed rate doctrine bars plaintiffs' claims, we would effectively be excluding PMI from the reach of RESPA, a result plainly unintended by Congress ." Id. at 764 (emphasis added). Given that the filed-rate doctrine rests upon the principle that "[w]here the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer 'can claim no rate as a legal right that is other than the filed rate[,]' " see Taffet , 967 F.2d at 1494 (quoting Montana-Dakota Utils. Co. , 341 U.S. at 251, 71 S.Ct. 692 ), Alston seems to be making the rather unremarkable point that the reach of the filed-rate doctrine can be circumscribed by legislation that confers to individuals a private right of action. Since nothing akin to RESPA's remedial provision exists here, Alston is not on point.