JORDAN, Circuit Judge, dissenting:
The federal filed rate doctrine, a creature of federal common law derived from various federal statutes, has been around since 1907. Despite its existence for over 100 years, Pennsylvania and Florida have so far not adopted it. The majority, without seeking guidance from the supreme courts of Pennsylvania or Florida, now confidently decrees that the federal filed *1328 rate doctrine is the governing rule in these two states. The majority also expands the filed rate doctrine to also bar claims against anyone whose contract seemingly concerns a filed rate. The majority then applies its sweeping rule to parties which have not filed any rates with state regulators.
I respectfully disagree with the majority's analysis and holding. First, I would certify this case to the supreme courts of Pennsylvania and Florida and ask whether they have adopted the filed rate doctrine in some form. Second, assuming that the filed rate doctrine applies in its unadulterated federal form, it does not bar a breach-of-contract claim that does not challenge a filed rate. Third, the filed rate doctrine does not-and should not-extend to lenders who are not regulated by rate-setting agencies, are not required to file rates, and are not sellers of filed rates.
I
The Supreme Court derived the federal filed rate doctrine from federal statutory and regulatory schemes. This case does not involve any such federal schemes; it instead concerns the regulatory systems of Pennsylvania and Florida. These two states require insurers to file insurance premiums (i.e., rates) with the appropriate state regulatory agencies. Because no federal law mandates these filings and no federal agency regulates these rates, we must look to the laws of Pennsylvania and Florida to determine whether something akin to the federal filed rate doctrine governs in these states.
A
The federal filed rate doctrine is a court-made rule crafted by the Supreme Court in the early 1900s. In one of the seminal cases, Texas & Pacific Railway Co. v. Abilene Cotton Oil Co. , 204 U.S. 426, 448, 27 S.Ct. 350, 51 L.Ed. 553 (1907), the Court barred a plaintiff from extracting a lower rate through litigation to avoid paying the higher rate set by a federal agency. The case turned on the Interstate Commerce Act. One of the ICA's goals was to ensure reasonable rates for railroad customers, so it required railroads to file proposed rates with the Interstate Commerce Commission and then to charge only those filed rates, assuming the ICC approved the rates as "reasonable." Id. But some customers were not satisfied that the ICC's approved rates were low enough, so they sued and demanded that the railroads charge lower rates. Id. at 430, 27 S.Ct. 350. The Court read the rate-filing provisions of the ICA to impliedly bar such suits. It reasoned that Congress meant the ICA to ensure "reasonable" rates only through the rate-setting process itself. Id. at 448, 27 S.Ct. 350.
The Supreme Court has applied the filed rate doctrine to other claims and industries regulated under the ICA. See, e.g. , Louisville & N. R.R. Co. v. Maxwell , 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915) ; Keogh v. Chi. & N.W. Ry. Co. , 260 U.S. 156, 160-63, 43 S.Ct. 47, 67 L.Ed. 183 (1922). And it has expanded the federal filed rate doctrine to other federal statutory schemes and industries, including utilities, insurers, and common carriers. See, e.g. , Ark. La. Gas Co. v. Hall , 453 U.S. 571, 573, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (rates filed with the Federal Energy Regulatory Commission pursuant to the Natural Gas Act); AT&T Co. v. Cent. Office Tel., Inc. , 524 U.S. 214, 221-28, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (rates filed with the Federal Communications Commission pursuant to the Communications Act of 1934).
These cases and others confirm that the Supreme Court has consistently treated questions about the existence and scope of *1329 the doctrine as a question of federal statutory interpretation. See, e.g. , Cent. Office. Tel. , 524 U.S. at 222-24, 118 S.Ct. 1956 (concluding that the filed rate doctrine applies to the Federal Communications Act because its relevant provisions were modeled on those in the ICA); MCITelecomms. Corp. v. AT&T Co. , 512 U.S. 218, 234, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) ("[T]here is considerable debate in other forums about the wisdom of the filed rate doctrine ... But our estimations, and the Commission's estimations, of desirable policy cannot alter the meaning of the [F]ederal Communications Act of 1934. For better or worse, the Act establishes a rate-regulation, filed-tariff system for common-carrier communications.") (citations and quotation marks omitted); T.I.M.E. Inc. v. United States , 359 U.S. 464, 468-70, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959) (noting that the issue is one of "statutory interpretation," engaging in a lengthy analysis of Congress' intent, and ultimately concluding that "[t]he structure and history" of the relevant federal act determined whether a party to the regulated transaction could challenge the reasonableness of past rates). And until now, we have applied this same approach. See, e.g. , Hill v. BellSouth Telecomms., Inc. , 364 F.3d 1308, 1311-12, 1315 (11th Cir. 2004) (observing that the federal filed rate doctrine applies to rates approved under the Federal Communications Act); Fla. Mun. Power Agency v. Fla. Power & Light Co. , 64 F.3d 614, 616 (11th Cir. 1995) (citing Ark. La. Gas Co. , 453 U.S. at 571, 101 S.Ct. 2925, for the proposition that the federal filed rate doctrine applies to rates approved by the Federal Power Commission/Federal Energy Regulatory Commission).
In short, for the federal filed rate doctrine to apply, it must be tied to a federal statute creating a federal regulatory scheme. When the regulatory scheme is instead created by a state, we must look to that state's law to figure out whether a state-law filed rate doctrine exists.
B
To determine whether a filed rate doctrine exists under state law, we first ask whether the state has adopted or disclaimed the filed rate doctrine. Barring an explicit holding from the state courts, we must either certify the question to the appropriate state supreme court or review the state's regulatory scheme and make an Erie guess, see Erie R. Co. v. Tompkins , 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), as to whether a filed rate doctrine exists under state law. What we cannot do is impose the federal filed rate doctrine on a state because its statutes appear similar to federal laws.
Our decision in Taffet v. Southern Co ., 967 F.2d 1483 (11th Cir. 1992) (en banc), exemplifies this methodology. There, we addressed whether electricity customers who sought to bring federal RICO claims against power companies for rates approved by state regulators in Alabama and Georgia. We analyzed those states' regulatory schemes and case law and concluded that those states appeared to have their own filed rate doctrines. See id . at 1490-94.
Taffet is not unique. The vast majority of federal and state courts look to state law to decide whether state regulatory schemes warrant a filed rate doctrine of some kind. See, e.g. , Alston v. Countrywide Fin. Corp. , 585 F.3d 753, 763-64 (3d Cir. 2009) ; Tex. Commercial Energy v. TXU Energy, Inc. , 413 F.3d 503, 507-10 (5th Cir. 2005) ; Knevelbaard Dairies v. Kraft Foods, Inc. , 232 F.3d 979, 992-93 (9th Cir. 2000) ; Rios v. State Farm Fire & Cas. Co. , 469 F. Supp. 2d 727, 735-36 (S.D. Iowa 2007) ;
*1330 Anzinger v. Ill. State Med. Inter-Ins. Exch. , 494 N.E.2d 655, 656-58 (Ill. App. Ct. 1986) ; Commonwealth ex rel. Chandler v. Anthem Ins. Cos., Inc. , 8 S.W.3d 48, 52-53 (Ky. Ct. App. 1999) ; Schermer v. State Farm Fire & Cas. Co. , 721 N.W.2d 307, 312-16 (Minn. 2006) ; Williams v. Union Fid. Life Ins. Co. , 123 P.3d 213, 219 (Mont. 2005) ; Richardson v. Standard Guar. Ins. Co. , 853 A.2d 955, 961-63 (N.J. Super. Ct. App. Div. 2004) ; N.C. Steel, Inc. v. Nat'l Council on Comp. Ins. , 496 S.E.2d 369, 372-73 (N.C. 1998) ; Edge v. State Farm Mut. Auto. Ins. Co. , 623 S.E.2d 387, 390-92 (S.C. 2005). There are some outliers, but they do not explain-much less justify-their approach. See, e.g. , Wegoland Ltd. v. NYNEX Corp. , 27 F.3d 17, 18-22 (2d Cir. 1994).
The majority cites several cases in an attempt to show that a state law analysis is unnecessary. But those cases provide the majority with little cover. First, in In re N.J. Title Insurance Litigation , 683 F.3d 451, 460 (3d Cir. 2012), the Third Circuit explicitly relied on New Jersey precedent analyzing the state's statutory framework and "conclud[ed] that 'the filed rate doctrine should be applied.' " Second, in H.J. Inc. v. Northwestern Bell Telephone Co. , 954 F.2d 485, 494 (8th Cir. 1992), the Eighth Circuit failed to engage in any analysis of the issue, choosing instead to summarily conclude that "[a]lthough little case law exists on this question, we see no reason to distinguish between rates promulgated by state and federal agencies." The majority is correct that the Second Circuit did not analyze state law in Rothstein v. Balboa Insurance Co. , 794 F.3d 256, 261 (2d Cir. 2015), but Rothstein does not explain why its approach is sound. We should not exacerbate the Second Circuit's error by importing it into our law, especially when doing so would require ignoring the sound analysis in a unanimous opinion by the en banc Eleventh Circuit in Taffet .
The Rules of Decision Act, in language essentially unchanged since its original enactment in 1789, provides that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C. § 1652. Absent a contrary rule in the U.S. Constitution, federal law, or a federal treaty, "the law to be applied in any case is the law of the state .... There is no federal general common law." Erie , 304 U.S. at 78, 58 S.Ct. 817. See also Mid-Continent Cas. Co. v. Am. Pride Bldg. Co. , 601 F.3d 1143, 1148 (11th Cir. 2010) (applying Florida law to a case regarding an insurer's "legal duties and obligations" because the issue was "not governed by the Constitution or treaties of the United States or Acts of Congress").
Federal common law does exist in areas involving " 'uniquely federal interests' " that "are ... committed by the Constitution and laws of the United States to federal control." Boyle v. United Techs. Corp. , 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (citing cases). But I fail to see how a state-law breach-of-contract claim against a private party that contracted with a state-regulated entity somehow touches on those matters committed to federal control, such as the country's foreign relations, the liability and immunity of federal officials, or admiralty law. The same goes for an affirmative defense based on a state regulatory scheme. See id . at 504-06, 108 S.Ct. 2510 ; Texas Inds., Inc. v. Radcliff Materials, Inc. , 451 U.S. 630, 640-41, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). Permitting the states to fashion rules for their own state agencies in this context does not create any "significant conflict between some federal policy or interest *1331 and the use of state law" to justify overriding those state rules. See Wallis v. Pan Am. Petrol. Co. , 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966) ; Richard H. Fallon, Jr., John F. Manning et al., Hart and Wechsler's The Federal Courts and the Federal System 646-49, 675 (7th ed. 2015).
C
The majority acknowledges this problem, but fails to grapple with its significance. It tacks onto its federal analysis a reference to the regulatory schemes in Pennsylvania and Florida and concludes that there is "enough to make an educated guess" that these states have adopted a filed rate doctrine. Maj. Op. at 1325. I disagree.
As the defendants admit, the Pennsylvania and Florida state courts have never said anything about the filed rate doctrine: "Neither Florida's nor Pennsylvania's highest court has decided whether the filed-rate doctrine bars claims like plaintiffs'. Nor have either state's intermediate appellate courts squarely addressed the issue." Fowler Caliber Br. at 16. Given this silence, the majority's "educated guess" is nothing more than a hopeful shot in the dark.
The majority cites several cases from Florida, but not one adopted or even mentioned the filed rate doctrine. See Nat'l Council on Comp. Ins. v. Fee , 219 So. 3d 172, 175 (Fla. 1st DCA 2017) ; Int'l Patrol & Detective Agency Co. v. Aetna Cas. & Sur. Co. , 419 So.2d 323, 324 (Fla. 1982) ; Nationwide Mut. Ins. Co. v. Williams , 188 So.2d 368, 372 (Fla. 1st DCA 1966). I therefore fail to see how they are helpful.
The majority fares no better in Pennsylvania. The sole state appellate decision cited by the parties that comes close to being relevant is Petty v. Insurance Department , 878 A.2d 942, 946-47 (Pa. Commw. Ct. 2005). There, the court relied on its earlier decision in Ciamaichelo v. Independence Blue Cross , 814 A.2d 800 (Pa. Commw. Ct. 2002), to justify applying a state filed rate doctrine to bar claims of nonprofit hospital plan subscribers "for what [they] alleged to be the [insurance plans'] improper maintenance of excess reserve[ funds]." Petty , 878 A.2d at 944. Significantly, however, the Supreme Court of Pennsylvania later reversed Ciamaichelo , holding that the complaint did "not allege a rate injury claim" and explicitly declining to "address whether the filed-rate doctrine would have applied in this context." Ciamaichelo v. Independence Blue Cross , 589 Pa. 415, 909 A.2d 1211, 1218 & n.8 (2006). As a result, Petty is no longer a reliable indicator of Pennsylvania law.
My own search reveals only one other potentially relevant Pennsylvania state court case, an unpublished opinion from a Pennsylvania trial court. In Milkman v. American Travellers Life Ins. Co. , 2002 WL 778272 (Pa. Com. Pl. Apr.1, 2002), the court noted that "the Plaintiff's claims may be subject to the filed rate doctrine." Id. at *14 (emphasis added). It did not apply the doctrine, but simply noted its possible existence as a reason for the court to accept a settlement between the parties. Id. at *14-15. And it cited no Pennsylvania cases for support.
If we are looking for help as to Pennsylvania law, we should consider the Third Circuit's decision in Alston , 585 F.3d at 764-65, which refused to apply the federal filed rate doctrine. Although Alston did not definitely resolve whether Pennsylvania has adopted something akin to the federal filed rate doctrine in every context, *1332 as I discuss in more depth later, at the very least it demonstrates that the robust federal version the majority imposes here is inappropriate.[1]
We should pay particular attention to Alston because Pennsylvania is within the Third Circuit. Federal courts have long recognized that they should give some deference to the decisions of other federal courts deciding the law of a state within their respective circuits. See MacGregor v. State Mut. Life Assur. Co. of Worcester, Mass. , 315 U.S. 280, 281, 62 S.Ct. 607, 86 L.Ed. 846 (1942) (leaving "undisturbed the interpretation placed upon purely local law by a Michigan federal judge of long experience and by three circuit judges whose circuit includes Michigan" because there was "[n]o decision of the Supreme Court of Michigan" touching on the issue); Bishop v. Wood , 426 U.S. 341, 346 n.10, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (giving "great deference" to federal judges' interpretations of the laws of the state in which they sit); Westinghouse Elec. Supply Co. v. Wesley Const. Co. , 414 F.2d 1280, 1281 n.1 (5th Cir. 1969) (same). See also Abex Corp. v. Md. Cas. Co. , 790 F.2d 119, 125-26 (D.C. Cir. 1986) (noting that when the court of appeals "has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always") (citation and quotation marks omitted); Factors Etc., Inc. v. Pro Arts, Inc. , 652 F.2d 278, 279 (2d Cir. 1981) (explaining that "conclusive deference" should be given to "ruling[s] by a [federal] court of appeals deciding the law of a state within its circuit").
The majority disregards this lack of state precedent, sidesteps Alston , and concludes that the regulatory systems Pennsylvania and Florida have established are alike enough to those in Taffet to warrant imposing the federal filed rate doctrine. But we should not be so quick to think that any similar state regulatory system demands the adoption of the filed rate doctrine in its federal form.
The federal filed rate doctrine is not without its critics, as the Supreme Court has noted. See Square D Co. v. Niagara Frontier Tariff Bureau, Inc. , 476 U.S. 409, 417-23, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). The Court in Square D drew on the opinion below in the Second Circuit, written by Judge Friendly. He noted several criticisms of the robust federal filed rate doctrine adopted in Abilene Cotton and Keogh . For example, he argued that class actions had undermined one of the key policy reasons for the doctrine-to ensure equality among ratepayers-because most ratepayers can have their grievances addressed equally in a single action. See Square D Co. v. Niagara Frontier Tariff Bureau, Inc. , 760 F.2d 1347, 1352 (2d Cir. 1985). Moreover, trends toward deregulation have undermined another basis for the doctrine, the protection of rates heavily monitored by regulatory agencies. These schemes rely "on competition rather than regulation to insure the reasonableness of ... rates" so that "[e]xposing ratemaking to competitive forces," including antitrust *1333 and fraud litigation, is "the most significant aspect[ ] of this deregulation." Id. at 1354-55. See also Brief for the United States as Amicus Curiae Supporting Petitioners at 7, Square D Co. v. Niagara Frontier Tariff Bureau, Inc. , 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) (arguing that modern developments have "undercut the rationale relied on in Keogh and [have] render[ed] that decision obsolete and its continued application anomalous").
For these and other reasons, some state courts have chosen to adopt a narrow filed rate doctrine applicable only to certain rates established by particular state agencies. See, e.g. , Schermer , 721 N.W.2d at 313, 317 (initially noting that "[t]his court has not [previously] directly decided whether the filed rate doctrine applies to rates established by Minnesota regulatory agencies," and ultimately concluding, after lengthy weighing of various issues, that "the filed rate doctrine applies generally to rates filed with and approved by the [Minnesota Department of Commerce]"). Other state courts have ducked the question or adopted the doctrine only in limited circumstances. See, e.g. , Qwest Corp. v. Kelly , 204 Ariz. 25, 59 P.3d 789, 792 (Ariz. Ct. App. 2002) (noting that "Arizona courts have not yet considered" whether to adopt a "filed rate doctrine," and ultimately deferring the question); Satellite Sys., Inc. v. Birch Telecom of Okla., Inc. , 51 P.3d 585, 588 (Okla. 2002) (refusing to decide whether to adopt a state version of the federal filed rate doctrine for tariffs filed with the Oklahoma Corporation Commission, but holding that even if the doctrine were to be adopted it would not bar a claim for common-law fraud).
Some states have chosen to adopt an alternative to the federal filed rate doctrine. For example, California rejects the filed rate doctrine and allows lawsuits challenging the reasonableness of rates. See Cellular Plus, Inc. v. Sup. Ct. , 14 Cal.App.4th 1224, 18 Cal.Rptr.2d 308, 318 (1993) (rejecting, in a challenge to state-regulated cell phone service rates, the contention that a state filed rate doctrine applies: "We ... are not compelled to follow the Keogh and Square D rulings ... [because, among other reasons,] the instant action pertains to the cellular telephone industry and the [state Public Utility Commission's] regulatory authority over providers of such service, whereas Keogh and Square D dealt with the [federal] ICC's regulatory authority over common carriers"). In Mississippi, claims for breach of fiduciary duty, breach of the implied covenants of good faith and fair dealing, and fraud are not barred by the filed rate doctrine because they derive from the common law. See Am. Bankers Ins. Co. of Fl. v. Alexander , 818 So.2d 1073, 1083 (Miss. 2001). Montana, for its part, holds that the filed rate doctrine does not apply to rates set by a state regulatory agency. See Williams v. Union Fidelity Life Ins. Co. , 329 Mont. 158, 123 P.3d 213, 219 (2005).
Nor is the filed rate doctrine, even in its federal form, necessarily as robust as the majority assumes. Federal courts have long held that claims that touch on regulated entities or rates are not barred by the filed rate doctrine, as long as they do not challenge the reasonableness of the rate. See Litton Sys., Inc. v. AT&T Co. , 700 F.2d 785, 820 (2d Cir. 1983) (concluding that the filed rate doctrine was inapplicable to an antitrust challenge that a service connected to the rates was unlawfully charged by the regulated entity because the issue "is not the reasonableness of the interface tariff rate as compared to some other rate that might have been charged, *1334 but instead whether the [service] requirement itself was reasonable, i.e., whether there should have been any charge at all"). See also City of Kirkwood v. Union Elec. Co. , 671 F.2d 1173, 1179 (8th Cir. 1982) (holding that the filed rate doctrine does not bar claims for antitrust damages where plaintiffs do not challenge the reasonableness of rates, but their competitive effect); Gulf States Utils. Co. v. Ala. Power Co. , 824 F.2d 1465, 1472 (5th Cir. 1987) (noting that the filed rate doctrine does not bar courts from addressing breach-of-contract claims based on unconscionability or through fraud because "[b]y setting aside the contracts, the district court would not interfere with the FERC's rate-making powers").
I could go on, but there is no need to. The point is that states can choose, for their own reasons, not to have a filed rate doctrine, or to have one that is much narrower in scope than the federal version. The majority's unwarranted assumption that Pennsylvania and Florida would adopt a full-throated version of the federal filed rate doctrine is not faithful to our notions of federalism. Given the vast variety of approaches available to the states, which function as laboratories in our federal system, see New State Ice Co. v. Liebmann , 285 U.S. 262, 52 S.Ct. 371, 387, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting), we cannot blithely assume that anything like the federal filed rate doctrine exists (or will be adopted) in Pennsylvania or Florida. Even if we can assume the doctrine exists in these states, it requires yet another leap to assume that it functions in the same way as its federal counterpart.
D
We have said that "[w]hen substantial doubt exists about the answer to a material state law question upon which the case turns ... [we] should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law." Forgione v. Dennis Pirtle Agency, Inc. , 93 F.3d 758, 761 (11th Cir. 1996). See also Lehman Bros. v. Schein , 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) (suggesting that certification was "particularly appropriate in view of the novelty of the question and the great unsettlement of Florida law"); Looney v. Moore , 861 F.3d 1303, 1314 (11th Cir. 2017) ("Only a state supreme court can provide what we can be assured are 'correct' answers to state law questions, because a state's highest court is the one true and final arbiter of state law.") (citation and quotation marks omitted). Certification makes all the more sense where, as here, the issue is one of first impression and involves "policy implications." See Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co. , 832 F.3d 1318, 1326 (11th Cir. 2016).
Given the dearth of case law in Pennsylvania and Florida, I would certify to the supreme courts of these states two questions: (1) whether they would adopt a filed rate doctrine, and, (2) if so, in what form. See Pa. R. App. P. 3341 ; Fla. Const. art. V, § 3 (b)(6). We should not ignore the interests of these states in establishing their own regulatory schemes by harkening back to the now-discredited days of general federal common law. See Swift v. Tyson , 41 U.S. (16 Pet.) 1, 18-19, 10 L.Ed. 865 (1842).
II
Inflicting federal strictures on state regulatory systems is not the majority's only error. Even if something like the federal *1335 filed rate doctrine applies in Pennsylvania and Florida, there is no reason for it to bar the homeowners' breach-of-contract claims.
A
At issue here are two distinct contracts: one between the homeowners and the lenders of their mortgages, and one between the lenders and the insurance companies who sold hazard insurance to the lenders. I treat the two actions before us ( Patel and Fowler ) as one because the complaints are virtually identical, except for the identities of the lender defendants.
The homeowners mortgaged their property or borrowed money through loans secured by their homes. The lenders are Caliber Home Loans, Inc. and Specialized Loan Servicing, LLC (collectively, "the lenders"), which bought commercial hazard insurance from American Security Insurance Company.
The mortgage contracts between the homeowners and the lenders are entirely distinct from the commercial insurance agreements between the lenders and ASIC. The mortgage contracts give the homeowners a choice to either buy hazard insurance themselves or to reimburse the lender for "the cost" of insurance. See Fowler Complaint ¶ 48.[2]
When the homeowners failed to insure their homes, the lenders bought hazard insurance to protect themselves from loss in case the homes were damaged. The lenders purported to pay the price of hazard insurance ASIC submitted in schedules to state insurance regulators in Pennsylvania and Florida. See Patel Appellees' Br. at 7-8; Fowler ASIC Br. at 9-10; Fowler Caliber Br. at 17-18. These schedules disclose the nominal price of the hazard insurance that ASIC charges every customer, including the lenders.
The homeowners claim that the lenders found a way to pay less than this regulated price. The complaints allege that the lenders engaged in several transactions with ASIC that amounted to kickbacks. See, e.g. , Fowler Complaint ¶¶ 3, 6, 25-28, 31-33, 36, 37, 39. These transactions effectively lowered the amounts the lenders paid for insurance.
The scheme alleged by the homeowners has two components. First, ASIC paid the lenders commissions that discounted their cost of insurance. A typical insurance customer might purchase insurance through an independent broker and pay that person a commission. Here, the "brokers" were in fact affiliated with the lenders themselves, so the commissions effectively discounted the lenders' purchase of insurance. Second, the lenders induced ASIC to provide other forms of value to retain their business. For instance, ASIC performed some of the lenders' mortgage-servicing *1336 work for less than fair-market value. The lenders also "sold reinsurance" of the same policies back to ASIC without risk. The homeowners allege that these and other transactions discounted "the cost" the lenders paid ASIC for insurance, which was significantly lower than the nominal price the lenders supposedly paid.
Nevertheless, the lenders still required the homeowners to reimburse them for the full nominal price, or "the cost," of the force-placed insurance as required by the mortgage contracts. The homeowners contend that because the kickbacks reduced the cost the lenders paid, the amount they must reimburse the lenders should also be reduced. Accordingly, they assert various federal and state-law claims against the lenders, and against ASIC for participating in and benefiting from the purported unlawful scheme.
B
ASIC and the lenders argue that the filed rate doctrine bars the homeowners' claims because they amount to generalized grievances that ASIC's insurance rates are unreasonably high, and seek only to force the defendants to sell (in ASIC's case) or bill for (in the lenders' case) insurance at lower rates. See Patel Appellees' Br. at 12; Fowler ASIC Br. at 17; Fowler Caliber Br. at 9. But that argument misreads the homeowners' claims. The homeowners assert that, regardless of the insurance rate ASIC charged, the lenders are contractually obligated to charge only the amount of insurance they actually paid. By engaging in side agreements with ASIC for "commissions," "reinsurance," and other kickbacks-transactions that are of course, unregulated-the lenders found a way to discount their insurance costs. Given that the mortgage contracts between the homeowners and the lenders required the lenders to charge the homeowners for only "the cost" of insurance, the lenders breached those contracts by demanding more than the discounted cost they paid ASIC. See, e.g. , Patel Compl. ¶¶ 5, 26, 32, 33, 47, 89.
The majority ignores this theory at the heart of the homeowners' case. The majority concludes, in a reductive characterization of the claims, that they are wholly about challenging filed rates. But at the motion to dismiss stage, we must read the facts alleged in the light most favorable to the homeowners, allow the pleading of alternative and inconsistent theories, and keep "the good and leave[ ] the bad." Jones v. Bock , 549 U.S. 199, 221, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). See also Gates v. Khokhar , 884 F.3d 1290, 1296 (11th Cir. 2018) ; United Techs. Corp. v. Mazer , 556 F.3d 1260, 1273-74 (11th Cir. 2009). The majority violates these precepts by construing the federal filed rate doctrine so broadly as to bar claims that have nothing to do with filed rates.
C
The majority also ignores how the federal filed rate doctrine works in practice. Even if the doctrine applies here, and even if we read the complaints to touch on rates filed with state regulators, the defendants have still failed to demonstrate the facts necessary to invoke the doctrine's protection.
The federal filed rate doctrine is an affirmative defense. See In re Rawson Food Serv., Inc. , 846 F.2d 1343, 1349 (11th Cir. 1988). See also E. & J. Gallo Winery v. EnCana Corp. , 503 F.3d 1027, 1039 n.11 (9th Cir. 2007) ("In a number of cases, such as this one, a buyer brings a state law *1337 or federal antitrust action against a seller, who in turn raises the filed rate doctrine as an affirmative defense."). At the motion to dismiss stage, we may dismiss a complaint based on an affirmative defense only "when [the] allegations, on their face"-including any facts established by external documents that the court is permitted to consider-"show that an affirmative defense bars recovery on the claim." Cottone v. Jenne , 326 F.3d 1352, 1357 (11th Cir. 2003). Because the federal filed rate doctrine can bar a claim "only where there are validly filed rates," Florida Municipal , 64 F.3d at 616, the defendant relying on the doctrine must show that a validly filed rate governs the transaction at issue.
Florida Municipal exemplifies this requirement. There, an electricity customer (a municipal agency) wanted to buy certain electricity services-called "network service"-but the utility refused to sell. See id . at 615. The agency sued, asserting breach of contract and antitrust claims. The utility countered that the federal filed rate doctrine barred the suit because the agency actually wanted to modify different services-called "point-to-point" services-the price for which was on file with the Federal Energy Regulatory Commission pursuant to the Federal Power Act. See id . The district court granted summary judgment for the utility on the federal filed rate doctrine, but we vacated the judgment. We held that it was an open question whether "network service" was distinct from "point-to-point" service, and consequently whether the rates for "point-to-point" service were at issue. See id. at 617. If network services were "distinct" and there was no filed rate for that service, then "the doctrine would not confer immunity." Id . at 616. We therefore remanded for fact-finding as to whether there was a meaningful distinction between the services sought and the services for which FERC had approved a filed rate. See id . at 617.
In short, we confirmed in Florida Municipal that regulated sellers are not immune from litigation when the claim does not concern the entity's regulated services. See id . And we reinforced the common-sense notion that whether a filed rate applies to a given transaction is a precise factual inquiry, not a loose analysis to be done freehand.
In the absence of Pennsylvania or Florida precedent adopting some form of the filed rate doctrine, we do not know what these states would require for the lenders or ASIC to assert it as a defense. The scope of an affirmative defense is usually defined by the jurisdiction that established it. See Hicks on Behalf of Feiock v. Feiock , 485 U.S. 624, 629-30, n.3, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (holding that federal courts "are not at liberty to depart" from state court decisions recognizing elements of an affirmative defense or "to apply a different rule however desirable it may believe it to be"). See also Structural Polymer Grp., Ltd. v. Zoltek Corp. , 543 F.3d 987, 992 (8th Cir. 2008) ("whether a contention is an affirmative defense is a question of state law") (citation and quotation marks omitted). But even if we assume that Pennsylvania and Florida have adopted the full version of the federal filed rate doctrine, the defendants have not met their burden to assert it as a defense.
Here, as in Florida Municipal , the defendants seek to invoke the filed rate doctrine without having established that a state filed rate actually governs the challenged transactions-e.g., the kickbacks the lenders received from ASIC. The record reveals that ASIC submitted some rate filings with the district court. See *1338 Fowler D.E. 91 at 12 (taking judicial notice of Rebecca H. Voyles Decl., D.E. 23-4); Patel D.E. 36 at 4 (taking judicial notice of various rate-schedule documents purportedly filed with state regulators, D.E.s 22-7, 22-13, and 22-15 through 22-18). But none of these documents mention the side agreements described in the homeowners' complaints.
Moreover, while it is theoretically possible that ASIC's rate filings included the "commissions" paid to the lenders, the record is devoid of any reference that such filed rates exist. SLS and ASIC argue at one point that state regulators approved the commission rates, see Patel Appellees' Br. at 10, but they cite no facts or record evidence in support of this contention. Their only authority is a Florida circuit court decision under the Florida Public Records Act that is at best tangentially related because it merely mentions ASIC's Florida rate filings. See Am. Sec. Ins. Co. v. Fla. Office of Ins. Reg. , 2015 WL 10384359 (Fla. Cir. Ct. 2015).
Affirmative defenses are not established by silence, especially at the motion to dismiss stage. We cannot and should not assume that the filed rate doctrine bars the homeowners' complaints without proof that such filed rates exist.
D
Applying the federal filed rate doctrine here also conflicts with the goals that underpin it. If the homeowners' claims are true, ASIC has discounted its customers' insurance costs through a kickback scheme, and has failed to charge the filed rates or treat the lenders equally with other customers in the market.
The filed rate doctrine avoids unreasonable price discrimination by "foreclosing the possibility that carriers maintain one rate on file while either negotiating another (secret) lower rate with some shippers or providing those shippers with illegal rebates or discounts." In re Olympia Holding Corp. , 88 F.3d 952, 956 (11th Cir. 1996). In this way, the doctrine "protects smaller shippers from being undercut competitively." Id. See also Cent. Office Tel. , 524 U.S. at 223, 118 S.Ct. 1956 ("While the filed rate doctrine may seem harsh in some circumstances ... its strict application is necessary to prevent carriers from intentionally misquoting rates to shippers as a means of offering them rebates or discounts, the very evil the filing requirement seeks to prevent.") (quotation marks and citation omitted).
This is why the Sixth and Third Circuits have concluded that the filed rate doctrine does not apply to challenges against agreements for which there are no filed rates. The Sixth Circuit, for example, allowed the plaintiffs' "challenge [because it] d[id] not concern the particular rate set by the [state regulator], but rather [involved] payments made outside of the rate scheme." Williams v. Duke Energy Int'l, Inc. , 681 F.3d 788, 797 (6th Cir. 2012). The filed rate doctrine did not apply because " 'the side agreements at issue and the kickbacks paid pursuant to those agreements were not approved by, filed with, or even supervised by the [state regulator].' " Id . at 797. Likewise, in Alston , the plaintiffs argued that they were "challeng[ing] the payment of kickbacks, not the rates they paid for [private mortgage insurance]." 585 F.3d at 764. Because "those kickbacks [were] not, of course, filed with Pennsylvania," the plaintiffs asserted that "the [filed rate] doctrine d[id] not apply." Id . The Third Circuit agreed, explaining that the "plaintiffs d[id] not challenge directly the reasonableness or fairness of any rate set by *1339 the Commonwealth of Pennsylvania," but instead challenged a "captive reinsurance arrangement constitut[ing] an alleged [illegal] kickback or fee-splitting scheme." Id. The plaintiffs' challenge concerned the defendant's "allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct." Id . at 765. See also Blaylock v. First Am. Title Ins. Co. , 504 F.Supp.2d 1091, 1099-1103 (W.D. Wash. 2007) (declining to extend the filed rate doctrine under Washington law to claims by homeowners that they obtained title insurance from insurers who paid illegal kickbacks and inducements).
The majority argues that Alston is inapposite because the claims there arose under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2607(d)(2). It makes sense, the majority says, that a federal statute like RESPA could circumscribe the filed rate doctrine. But that underscores the doctrine's federal nature. As a creature of federal common law derived from federal statutes, like the ICA in Abilene Cotton , Congress can displace the doctrine with legislation. See City of Milwaukee et al. v. Illinois et al. , 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) ("[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of law-making by federal courts disappears."). Moreover, if the Third Circuit thought that RESPA preempted Pennsylvania's filed rate doctrine, it is curious that it did not discuss RESPA's preemptive scope. See Rice v. Santa Fe Elevator Corp. , 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) (requiring the "clear and manifest purpose of Congress" for a federal statute to preempt state law). Alston concluded that the plaintiffs' kickback-scheme claims did not concern a filed rate, and thus it was "absolutely clear that the filed rate doctrine simply d[id] not apply." 585 F.3d at 765. Such a holding is not couched in the language of preemption.
The majority says that we should instead look to the Second Circuit's example in Rothstein . In that case, the Second Circuit faced similar claims against an insurer and its customers (lenders) for arranging a kickback scheme that charged homeowners for more than the actual cost of hazard insurance. See Rothstein , 794 F.3d at 259. The Second Circuit held that the "rebates," "kickbacks," and "free services,"-even though they were separate transactions from the ones between the insurer and lender for the hazard insurance-were still challenges against the insurance transaction itself. See id . at 259, 263. Rothstein , however, made two errors that we should not repeat.
First, the Second Circuit abdicated its duty to consider whether a challenged arrangement between an insurer and its customer is covered by a filed rate. It chose not to follow our precedent in Florida Municipal because, although the plaintiffs' claims concerned several separate transactions between separate parties, "there [wa]s a single (regulated) product." Id. at 264 n.5. But, as FloridaMunicipal explained, a court must determine based on the facts of the case whether each transaction concerns a filed rate. See 64 F.3d at 617. And Florida Municipal , not Rothstein , constitutes binding precedent in this circuit.
Second, the Second Circuit doubled down on its error by claiming that once a regulator has "investigated" a similar complaint and "adopted a regulation restricting the practice," then "judicial endorsement of [the] [p]laintiffs' claims would displace and distort" the regulation *1340 of that practice. Rothstein , 794 F.3d at 263. But no controlling authority extends the filed rate doctrine to bar a lawsuit challenging transactions that regulators have disapproved, like the side transactions here. See Fla. Mun. , 64 F.3d at 616. Selling a regulated good or service at a discount from the filed rate is likewise forbidden by the filed rate doctrine, so suits to recover losses caused by such wrongful behavior are permitted. See, e.g. , Sec. Servs. v. K Mart Corp. , 511 U.S. 431, 440, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994) (cited in Florida Municipal , 64 F.3d at 616 ); Carnation Co. v. Pac. Westbound Conf. , 383 U.S. 213, 216, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) (also cited in Fla. Mun. , 64 F.3d at 616 ).
As the majority correctly notes, the homeowners' claims in Rothstein were solely against the insurer (the lender had settled out of the case). See Maj. Op. at 1327 n.8; Rothstein , 794 F.3d at 261. I concede that the homeowners' claims against the insurers, both here and in Rothstein , seem to be derivative of the claims against the lenders. Given that the homeowners are in privity of contract with only the lenders, the liability of an insurer would only arise from its participation in the lenders' wrongful overcharging of the homeowners under their mortgage contracts. I see no reason, however, why this dynamic should allow a rate-filer conducting unregulated transactions (or conducting regulated transactions at a rate other than the filed rate) to evade a lawsuit by invoking the filed rate doctrine.
Here, as in Williams and Alston , the challenges are to kickbacks or agreements other than the regulated transaction. Barring the homeowners' claims effectively immunizes all entities in the insurance market, and allows insurers to engage in side schemes that reduce rates for preferred customers-in violation of the principle that created the filed rate doctrine in the first place.
III
The majority's third and final misstep is the unwarranted extension of the filed rate doctrine to bar claims against the lenders as if they were regulated entities like ASIC. Even assuming that the filed rate doctrine applies in Pennsylvania and Florida in its federal form, and assuming that the defendants have successfully shown that a governing rate has been filed with a state regulator, the filed rate doctrine precludes claims only against regulated sellers-not downstream entities or resellers. The majority's holding, which sweeps in any entity that touches a regulated rate, is at odds with the federal filed rate doctrine.
Let us assume, as the lenders contend, that the homeowners complain merely that they are demanding reimbursement for insurance premiums that are unreasonably high. Even so, the homeowners' claims against the lenders should survive under the filed rate precedent that the majority cites. Why? Because the claims asserted are not against a regulated seller.
Pennsylvania and Florida regulate insurers through the Pennsylvania Insurance Commissioner and the Florida Office of Insurance Regulation. ASIC is the insurance company that filed rates for the relevant insurance product with these state agencies. None of the lenders did so, nor were they required to. The lenders simply bought the regulated insurance, supposedly at the filed rate, from ASIC. That transaction is the only sale regulated by the state agencies. Or, to look at it another way, none of the lenders have *1341 asserted that they filed a rate or that the relevant state agencies regulated their "resale" of insurance to the homeowners.
Allowing the homeowners' claims to go forward conforms with what have been called the "[t]wo rationales underl[ying] the [filed rate] doctrine"-"nonjusticiability" and "nondiscrimination." Maj. Op. at 1321. Here's why.
The nonjusticiability principle decrees that courts should not be rate-setters, which happens when a plaintiff asks a court to remedy an unreasonably high rate. But that could not happen here. Some of the homeowners' claims are against the lenders, not the regulated seller (ASIC). So any remedy obtained against the lenders for these claims would not require the homeowners to pay a different price-a court could never order the regulated seller (ASIC) to sell the regulated product (hazard insurance) to lenders at a different price. Thus, the nonjusticiability principle is not implicated here. See Hill , 364 F.3d at 1317 (noting that the "purpose of the nonjusticiability principle ... is to preserve the FCC's primary jurisdiction over determinations regarding the reasonableness of rates charged by regulated carriers ") (emphasis added).
The same is true for the "nondiscrimination" principle, which forbids plaintiffs from suing to get lower rates than other customers. See id. at 1316. Critically, the homeowners here do not seek a lower insurance rate. Imagine, for instance, that the mortgage contract between the lenders and the homeowners did not tie the cost of the hazard insurance to the actual cost paid by the lenders. The lenders are not regulated by the state agencies governing insurance, so they are not required to pass along the exact same rate they paid the insurer. The lenders could have charged the homeowners a flat penalty above the cost of insurance for the inconvenience of having to insure the homes, or the lenders could have waived any fee and absorbed the cost of the insurance themselves. In either case, a breach of contract claim (like a claim that the insurer charged a penalty higher than the contract allowed) would not concern the rate initially paid by the lenders to the insurer.
Significantly, the homeowners' costs are contractually tied to what the lenders actually paid for insurance. Although at first glance it might appear that the homeowners want to pay less for insurance than other customers on the market, in reality they only seek what their contract requires. Their claims, if true, might reveal that their lenders paid less than any other customers in the market due to an unlawful kickback scheme, but that is immaterial to the alleged breach at issue. The majority's extension of the filed rate doctrine permits unregulated lenders to immunize themselves by structuring their contracts to follow the filed rate.[3]
In response, the majority reasons that "the filed-rate doctrine's applicability does not turn on whether the plaintiff is a rate-payer ." Maj. Op. at 1322 (emphasis added). Maybe so, but the majority never actually justifies expanding the filed rate doctrine to bar a suit where the defendant is not a rate filer . It cites no Pennsylvania or Florida *1342 statute or regulation that governs regulated insurance products after ASIC sells it. Nor does it point to any court that has extended the filed rate doctrine to unregulated entities.
There are some decisions that have assumed or concluded that the filed rate doctrine could apply to a regulated buyer who resells a regulated product. Typically, however, the reason seems to be that no one contested the matter. See, e.g. , Alston , 585 F.3d at 764. The rare cases that address the issue come up empty-handed, as they can point to no reason to extend the doctrine to unregulated entities. See, e.g. , Roussin v. AARP, Inc. , 664 F.Supp.2d 412, 419 (S.D.N.Y. 2009) (rejecting plaintiff's challenge to an unregulated defendant's invocation of a New York version of the filed rate doctrine for the dubious reason that the plaintiff "offers no authority ... for the proposition that the filed rate doctrine cannot bar claims against entities not directly regulated by the rate-making authority"), aff'd , 379 F. App'x 30 (2d Cir. 2010).
The majority's hands are just as empty. The majority extends Rothstein -which, it admits, "dealt with claims against the insurer"-and argues that because the "underlying theory" is the same, Rothstein is persuasive. Maj. Op. at 1327 n.8. It points to no case that justifies its expansive view of the filed rate doctrine.
If the majority seeks a model for how to address claims against unregulated sellers of regulated products, it should look no further than Smith v. SBC Communications, Inc. , 178 N.J. 265, 839 A.2d 850, 856-60 (2004). In that case, the New Jersey Supreme Court analyzed the federal filed rate doctrine and concluded that telecommunication resellers generally could not invoke it. It held that the "[t]he independent resale of [regulated] services to a third party has no discriminatory effect" because everyone may "purchase the services under the same terms and with the same rates as those sold to a reseller." Id. at 859. "[D]amages resulting from a lawsuit involving the resale w[ould] not provide the victors with any type of discount" because "their claims arise out of a sales arrangement that exists completely independent of the original purchase agreement implicating the filed rate." Id. "To hold otherwise," the New Jersey Supreme Court concluded, would lead to the "nonsensical" outcome of a consumer "violat[ing] the FCA" by "purchas[ing] a calling card and then giv[ing] that card to a friend or relative free of charge." Id.
The analysis in Smith makes sense. The majority's contrary rule will allow unregulated entities to piggyback off the strict protections provided to regulated entities in exchange for their engagement with the regulatory scheme.
V
Whether some version of the filed rate doctrine applies in these cases is a matter of Pennsylvania and Florida law. We cannot assume, in the absence of state authority, that the filed rate doctrine applies in its federal form whenever an entity files rates with state agencies. Given the lack of state precedent on the issue, I would certify questions about the filed rate doctrine and its scope to the supreme courts of Pennsylvania and Florida.
Even if the federal filed rate doctrine exists in Pennsylvania and Florida, it does not and should not apply to unregulated transactions-like kickbacks-that do not involve a filed rate. And it should not be extended to lenders who do not file insurance rates with a state agency.
With respect, I dissent.

A district court in the Eastern District of Pennsylvania decided, three months before Alston , that the filed rate doctrine barred federal antitrust claims against an insurer who filed rates with the relevant Pennsylvania agency. See In re Penn. Title Ins. Antitrust Litig. 648 F.Supp.2d 663, 672-87 (E.D. Pa. 2009). Alston may have effectively overruled Pennsylvania Title , but even if it did not, the conflict between these two federal decisions demonstrates that there is an open question whether and in what form Pennsylvania applies the filed rate doctrine.

The specific language in the mortgage contracts is:
5. Property Insurance ....
If Borrower fails to maintain any of the [hazard insurance] coverages described above, Lender may obtain insurance coverage , at Lender's option and Borrower's expense .... Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.
Fowler Complaint ¶ 48 (emphasis added). See also id. ¶¶ 64, 77; Patel Complaint ¶¶ 49, 62.

As a policy matter, I am not sure that is a good idea. Cf. Hill v. BellSouth Telecomms., Inc. , 364 F.3d 1308, 1317-18 (11th Cir. 2004) (Edmondson, C.J., dissenting) ("I think today's court extends the judge-made filed-rate doctrine too far: Congress intended not to remove from the states the power to prevent deceptive trade practices ... and [claims] for fraud and negligent misrepresentation.").